UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION


UNITED CONSUMERS CLUB, INC.,      )
UNITED CONSUMERS CLUB              )
FRANCHISING CORPORATION, BETA      )
FINANCING COMPANY, and             )
NATIONAL MANAGEMENT                )
CORPORATION,                       )
                                   )
          Counterplaintiffs,       )
                                   )
     v.                            )   Case No.  2:97 CV 276
                                   )
                                   )
MARK BLEDSOE, KELLY BLEDSOE        )
n/k/a BUCKLEY, KELLMARK            )
CORPORATION d/b/a/ United          )
Consumers Clubu of Buffalo,        )
New York, ENG LIM, DENNIS          )
GAIN, PERSONA GRATA NORTH          )
AMERICA d/b/a United Consumers     )
Club of Providence, Rhode          )
Island, STEVEN ADOLPHI, CARRIE     )
ADOLPHI, S.A.C.A., INC., d/b/a     )
United Consumers Club of           )
Syracuse, Rhode Island, THOMAS     )
CALLAHAN, SR., THOMAS CALLAHAN,    )
JR., TEC ASSOCIATES d/b/a          )
United Consumers Club of           )
Baltimore, Mariland, JAMES         )
COCHRAN, MONICA COCHRAN,           )
COCHRAN MANAGEMENT SERVICES        )
d/b/a United Consumers Club of     )
Ann Arbor, Michigan, and the       )
EMANCIPATION TRUST,                )
                                   )
          Counterdefendants        )


<u>OPINION and ORDER</u>

     This matter is before the court on the Motion for Summary

Judgment filed by the counterdefendants, Mark Bledsoe et al., on

February 22, 2006; the Motion to Strike filed by the counter-

plaintiffs, United Consumer Club, Inc. et al. (collectively "UCC") on April 29, 2006; and the Motion to Strike contained within the counterdefendants' Reply Brief filed on May 27, 2006. For the reasons set forth below, the motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, and both motions to strike are **GRANTED**.

Background

This case began in 1997 as a nine-count complaint in which eight United Consumers Club ("UCC") franchises and 15 individual officers of the franchises claimed that they were the victims of a fraudulent scheme devised by the defendants, UCC, and related individual officers and corporate entities UCC Franchising Corporation, National Management Corporation, and Beta Finance Company, regarding the nature of the franchises and UCC member-ships.

The plaintiffs' original complaint alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962(c) and (d), fraudulent misrepresentation of facts, negligent misrepresentation, breach of the implied covenant of good faith, deceptive business acts and practices, and false advertising. (DE 1) On June 23, 1998, this court granted in part and denied in part the defendants' motion to dismiss. (DE 43) In that opinion, the court found that the two RICO claims survived dismissal insofar as they asserted causes of action against five individual defendants, the claim for fraudulent misrepresentation survived against the corporate defendants and some individual

defendants, and the state law claims for negligent misrepresenta-
tion and breach of the implied covenant of fair dealing survived
for failure to brief a conflict of law issue. (*See* DE 43, pp. 31-
32, 35) On August 17, 1998, the plaintiffs filed an amended
complaint dropping the later two state law claims from the
original complaint.  However, the amended complaint retained the
two RICO claims and the claim for fraudulent misrepresentation.
It also added plaintiffs James Cochran, Monica Cochran, and
Cochran Management Services.  (DE 50)

Three years after the court ruled on the motion to dismiss,
the defendants sought reconsideration in light of a subsequent
Seventh Circuit opinion addressing a nearly identical lawsuit.
*See* ***Stachon v. United Consumer Club, Inc.***, 229 F.3d 673, 674 (7th
Cir. 2000). The Seventh Circuit's opinion in ***Stachon*** compelled
this court to reconsider and dismiss the plaintiffs' RICO claims
against all defendants on April 25, 2001, leaving only the claims
for fraudulent misrepresentation. (DE 125, p. 9) On March 5,
2001, this court further narrowed the remaining fraud claims. (DE
139)  In that opinion, the court held that the Cochran individual
and corporate claims were barred by the statute of limitations,
the Callahan individual plaintiffs lacked standing to sue, and
that summary judgment was appropriate against corporate plaintiff
TEC Associates because the company had signed a release of
claims. (DE 139)

On July 16, 2001, the defendants filed a second motion for
summary judgment on the fraud claims of the remaining plaintiffs:

1) Steven and Carrie Adolphi and their club S.A.C.A., Inc.; 2)
Mark and Kelly Bledsoe n/k/a Buckley and their club Kellmark
Corp.; and 3) Eng Lim and Dennis Gain and their club Persona
Grata North America, Inc. (DE 142) By stipulation of the parties
on August 28, 2002, the remaining individual plaintiffs dropped
their suit, leaving only the associated corporate claims. (DE
152) By orders dated September 3, 2003 and December 7, 2005, the
only claim which survived summary judgment was Kellmark's single
fraud claim under New York Law pertaining to UCC's "proven
marketing system." (DE 157, 218) The court granted a directed
verdict in favor of the defendants on this claim at trial on July
27, 2005. (DE 208)

After this lengthy history, the only remaining issue is the
defendants' expansive counterclaim alleging conspiracy to commit
various torts and breaches of contract. Pursuant to the parties'
August 28, 2002 stipulation, the only counterdefendants on this
counterclaim are the individual defendants, Eng Lim, Dennis Gain,
Steven and Carrie Adolphi, Mark and Kelly Bledsoe n/k/a Buckley,
Thomas Callahan Sr., Thomas Callahan Jr., and James and Monica
Cochran. (DE 152) The remaining corporate counterdefendants are
Persona Grata North America, Kellmark, TEC Associates, S.A.C.A.,
Inc., and Cochran Management Services. The "Emancipation Trust,"
created to fund the plaintiffs' suit, also remains a counterde-
fendant. In addition to the procedural background outlined
above, the following facts relate to the counterclaim.

At least as early as May 26, 1997, some of the counterdefen-

4

dants were contemplating action against UCC and had formed the Emancipation Trust. (UCC Exh. E) On June 2, 1997, Mark Bledsoe of Kellmark notified counterdefendants' counsel that the counterdefendants unanimously had determined not to assist other franchises in potential actions that may arise against UCC due to conflict-of-interest and funding concerns. Bledsoe also reported the counterdefendants' desire to have "complete authority to coordinate timing and choice of media coverage and publicity as we deem necessary to protect the trust indenture." (UCC Ex. E)

On August 7, 1997, the counterdefendants filed this suit. On August 14, 1997, the counterdefendants notified UCC of their "intent to rescind their respective franchise agreements with UCC based on fraud in the inducement of said agreements" by letter from counterdefendants' counsel. (UCC Exh. A) This letter outlined the closure plans for seven counterdefendant franchises, including servicing only existing members through September 1, 1997, and the termination of all operations by October 31, 1997. Attorney Mario Herman enclosed copies of letters the counterdefendants planned to send to 1) the Office of the Attorney General in the four states where the counterdefendants' franchises operated, and 2) the individual consumers who were franchise members. (UCC Exh. A)

At some point between August 14 and 25, 1997, UCC began withholding revenues and accounts receivable due the counterdefendant clubs. (Pl. Exh. 8; UCC Exh. F) On August 25, 1997, the counterdefendants notified UCC that, due to UCC's actions, the

counterdefendants were unable to close in stages as planned and
instead would cease all business immediately. (UCC Exh. B) The
same day, the counterdefendants sent letters to the State Attor-
ney General indicating that suit had been filed, that UCC was
withholding funds, and that the franchises had intended to close
by November 1, 1997, but were now closing immediately. (Pl. Exh.
8) Also on August 25, 1997, the counterdefendants notified UCC of
their actions. (UCC Exh. B) Finally, in an undated letter presum-
ably sent at the same time (as it references immediate closure),
the counterdefendants notified their club members: 1) a lawsuit
had been filed with "causes of action for fraud and violations of
the Federal RICO statute, including an allegation that UCC is
buying second quality products from sources other than direct
from the manufacturers and adding markup to those prices;" 2) a
copy of the federal complaint had been sent to the state attorney
general; and 3) UCC had withheld operating funds in retaliation
for the lawsuit, forcing the clubs to close immediately.  The
member letter then clarified the status of purchase orders,
membership payments, and incoming merchandise.  The letter also
gave members several phone numbers at UCC to call with questions.
(UCC Exh. C)

     During their depositions, the individual counterdefendants
denied knowledge of a pre-planned, coordinated agreement to close
seven franchises at a designated point in time. (Thomas Callahan
Dep. p. 190; Mark Bledsoe Dep. p. 401; Eng Lim Dep. p. 367;
Steven Adolphi Dep. p. 281) These denials came in spite of the

letters from plaintiffs' counsel outlining the coordinated
activities.

## Discussion

### A.  Motions To Strike

The counterdefendants have not responded to UCC's motion to
strike, subjecting it to summary ruling pursuant to Local Rule
7.1(a).  Accordingly, this motion is granted.

In support of its brief in response to summary judgment, UCC
includes a photograph allegedly depicting counterdefendant Eng
Lim in the hallway of the Westin Rosemont Hotel on November 23,
1997, the date of a UCC franchisee conference. This photograph
has not been authenticated as required by Federal Rule of Evi-
dence 901, and Lim denies any recollection of being at the
Westin. (Eng Lim Dep. pp. 173-75) Therefore, the court excludes
the photograph from evidence, as well as UCC's contention in part
I(G) of its brief that Lim distributed information about lawsuits
against UCC at the Westin on November 23, 1997.

### B.  Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), summary
judgment is proper only if it is demonstrated that "there is no
genuine issue as to any material fact and the moving party is
entitled to a judgment as a matter of law." *See **Celotex Corp. v.
Catrett***, 477 U.S. 317, 322-23, 91 L.Ed.2d 265, 106 S.Ct. 2548
(1986); ***Lawrence v. Kenosha County***, 391 F.3d 837, 841 (7th Cir.
2004); ***Branham v. Snow***, 392 F.3d 896, 901 (7th Cir. 2004); ***Windle
v. City of Marion***, ***Indiana***, 321 F.3d 658, 660-61 (7th Cir. 2003),

*cert. denied*, 540 U.S. 873, 124 S.Ct. 873, 157 L.Ed.2d 133 (2003). The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. ***Adickes v. S.H. Kress & Company***, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); ***Lawrence***, 391 F.3d at 841. A fact is material if it is outcome determinative under applicable law. ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); ***Ballance v. City of Springfield, Illinois Police Department***, 424 F.3d 614, 616 (7th Cir. 2005); ***Hottenroth v. Village of Slinger***, 388 F.3d 1015, 1027 (7th Cir. 2004); ***Palmer v. Marion County***, 327 F.3d 588, 592 (7th Cir. 2003). Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals a good faith dispute as to inferences to be drawn from those facts. ***Spiegula v. Hull***, 371 F.3d 928, 935 (7th Cir. 2004); ***Hines v. British Steel Corporation***, 907 F.2d 726, 728 (7th Cir. 1990). Finally, summary judgment "will not be defeated simply because motive or intent are involved." ***Roger v. Yellow Freight Systems, Inc.***, 21 F.3d 146, 148 (7th Cir. 1994). *See also* ***Miller v. Borden, Inc.***, 168 F.3d 308, 312 (7th Cir. 1999); ***Plair v E.J. Brach & Sons, Inc.***, 105 F.3d 343, 346 (7th Cir. 1997); ***United Association of Black Landscapers v. City of Milwaukee***, 916 F.2d 1261, 1268 (7th Cir. 1990).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party

opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511

*See also* **Reeves v. Sanderson Plumbing Prods., Inc**., 530 U.S. 133, 149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-22 (2000) (setting out the standard for a directed verdict); **Celotex Corp**., 477 U.S. at 322-323, 106 S.Ct. at 2553; **Branham**, 392 F.3d at 901; **Lawrence**, 391 F.3d at 841; **Hottenroth**, 388 F.3d at 1027 (stating that a genuine issue is one on which "a reasonable fact finder could find for the nonmoving party"); **Schuster v. Lucent Technologies, Inc**., 327 F.3d 569, 573 (7th Cir. 2003)(stating that a genuine issue exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party).

## 1. Tort Claims

As a preliminary matter, UCC argues that the counterdefendants have failed to address a number of UCC's discrete tort counterclaims on summary judgment. However, the facts underlying

UCC's conspiracy counterclaim, and the torts UCC alleges were committed by the conspiring counterdefendants, are so interrelated that the interests of justice require that the court address all of the tort counterclaims. Moreover, the parties have fully briefed the theory, central to all the unbriefed tort counterclaims except three, that the counterdefendants induced multiple breaches of contract through the concurrent closure of seven franchise clubs. Thus, the only tort counterclaims decided here without the benefit of briefing are UCC's claims for malicious prosecution, tortious interference with an advantageous relationship with club members, and tortious interference with a prospective advantage with new franchisees and members.[1] With respect only to those three claims, the parties will be provided with the opportunity to provide supplemental briefing prior to entry of judgment.

Under choice of law rules, Indiana law governs UCC's civil conspiracy and tort counterclaims. ***Allen v. Great American Reserve Insurance Company***, 766 N.E.2d 1157, 1164, 1168 (Ind. 2002), *rehearing denied*, 814 N.E.2d 662 (Ind. 2004). In Indiana, a civil conspiracy is defined as "a combination of two or more persons, by concerted action, to accomplish an unlawful purpose or to accomplish some purpose, not itself unlawful, by unlawful means." ***Indianapolis Horse Patrol, Inc. v. Ward***, 217 N.E.2d 626,

---

[1] As they appear in the amended counterclaim, these later two claims also are based on the same theory as the tortious interference with contract claims. However, the court will permit the parties to provide supplemental briefing on these claims in the event the court has misconstrued the amended counterclaim.

628 (Ind. 1966). Rather than constitute a separate cause of action, a conspiracy claim really is a "cause of action . . . for damages resulting from the conspiracy." **Ward**, 217 N.E.2d at 628. In sum, "allegations of a civil conspiracy are just another way of asserting concerted action in the commission of a tort." **Boyle v. Anderson Fire Fighters Association**, 497 N.E.2d 1073, 1079 (Ind. App. 1986). *See also* **Miller v. Ortman**, 136 N.E.2d 17, 33 (Ind. 1956) ("[I]f the acts committed were lawful there could be no . . . liability in damages because of a conspiracy to effect these lawful acts.").

A claimant need not establish conspiracy by direct evidence. *See* **Lake Mortgage Company, Inc. v. Federal National Mortgage Association**, 308 N.E.2d 739, 740 (Ind. App. 1974). Instead, "a civil conspiracy may be asserted through circumstantial evidence or by averment of isolated or independent facts susceptible of an inference of concurrence of sentiment." **Lake Mortgage**, 308 N.E.2d at 740 (*citing* **Moore v. Fletcher**, 196 N.E.2d 422, 434-35 (Ind. App. 1964)). In other words,

> [t]he law does not demand proof that each conspirator knew the exact limits of the illegal plan or the identity of all participants therein. But it does require that there be a single plan, the essential nature and general scope of which is known to each person who is to be held responsible for its consequences.
>
> **Richardson v. City of Indianapolis**, 658 F.2d 494, 500 (7th Cir. 1981)

If a conspiracy exists, the conspirators are jointly and severally liable for the torts committed in furtherance of the con-

spiracy. *See **Boyle***, 497 N.E.2d at 1079; ***Baker v. State Bank of Akron***, 44 N.E.2d 257, 260 (Ind. App. 1942).

UCC argues that this case constitutes malicious prosecution. As recently articulated by the Indiana Supreme Court, "[t]he essence of malicious prosecution rests on the notion that the plaintiff has been improperly subjected to legal process." ***City of New Haven v. Reichhart***, 748 N.E.2d 374, 378 (Ind. 2001). To set forth a *prima facie* case for malicious prosecution, a plaintiff must establish that "(1) the defendant . . . instituted or caused to be instituted an action against the plaintiff . . . ; (2) the defendant acted with malice in doing so; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor." ***Reichhart***, 748 N.E.2d at 378. The only two factors that can be disputed in this case are that the defendants acted with malice and without probable cause. These elements are inextricably linked, "as a finding of probable cause would negate the second and third elements of a claim for malicious prosecution." ***Glass v. Trump Indiana, Inc***., 802 N.E.2d 461, 467 (Ind. App. 2004).

When the relevant facts are not in dispute, the court may determine the existence of probable cause as a matter of law. *See **Reichhart***, 748 N.E.2d at 379; ***Executive Builders, Inc. v. Trisler***, 741 N.E.2d 351, 357 (Ind. App. 2000). A defendant to a malicious prosecution claim had probable cause to file his original suit "when a reasonably intelligent and prudent person would be induced to act as did the person who is charged with the

burden of having probable cause." ***Reichhart***, 748 N.E.2d at 379
(*quoting* ***Maynard v. 84 Lumber Company***, 657 N.E.2d 406, 409 (Ind.
App. 1995)). In analyzing probable cause, "the court may not
ignore the context in which the proceedings were terminated."
***Strutz v. McNagy***, 558 N.E.2d 1103, 1107 (Ind. App. 1990). For
example, probable cause exists when the law was unsettled at the
time the lawsuit commenced, even when the defendant loses his
cause of action in the course of litigation through subsequent
legal developments. *See* ***Willsey v. Peoples Federal Savings and
Loan Association of East Chicago***, 529 N.E.2d 1199, 1206 (Ind.
App. 1988); ***The Board of Commissioners of Hendricks County v.
King***, 441 N.E.2d 506, 509 (Ind. App. 1985). Similarly, the court
should not treat settlements and stipulations to dismiss as an
indication that a suit was meritless. *See* ***Strutz***, 558 N.E.2d at
1107. Finally, Indiana courts expressly have rejected invita-
tions to create liability for malicious prosecution when a party
merely brings a weak case. *See* ***Mirka v. Fairfield of America,
Inc.***, 627 N.E.2d 449, 452 (Ind. App. 1994); ***Willsey***, 529 N.E.2d
at 1206. Creating liability "only for negligence, for the bring-
ing of a weak case, would be to destroy an attorney's efficacy as
advocate of his client and his value to the court, since only the
rare attorney would have the courage to take other than the easy
case." ***Mirka***, 627 N.E.2d at 452. *See also* ***Willsey***, 529 N.E.2d at
1206 ("To hold otherwise, would have a chilling effect on all
litigation.").

The original claims in this litigation cannot be construed as malicious prosecution, even though the counterdefendants ultimately lost their suit. Contrary to UCC's allegation that the counterdefendants' lawsuit was meritless, this court found that the principal claims of RICO violations and fraud survived a motion to dismiss against at least some of the counterplaintiffs and only rejected one state law claim. The court was compelled to reconsider its opinion on the RICO claims only after the Seventh Circuit subsequently clarified the law regarding claims against individual defendants. The counterdefendants' loss under these circumstances is not evidence that the RICO claims lacked merit at the time they were filed. *See* ***Willsey***, 529 N.E.2d at 1206; ***King***, 441 N.E.2d at 509. Furthermore, the counterdefendants' subsequent voluntary dismissal of the two remaining state law claims is not evidence of malicious prosecution, given the claims' secondary importance to the overall lawsuit. Likewise, the court will not use the parties' joint stipulation to dismiss the individual counterdefendants' claims against those individuals here. *See* ***Strutz***, 558 N.E.2d at 1107. Additionally, some of the claims were dismissed based on the statute of limitations, not on the merits. Finally, the court notes that even after two rounds of summary judgment motions, counterdefendant Kellmark's fraud claim survived for trial. The total history of this case belies the suggestion that it was so lacking in merit that a reasonable inquiry into the law would have dissuaded the counter-

defendants from filing suit[2]. *See **Mirka***, 627 N.E.2d at 452.
Therefore, the counterclaim for malicious prosecution fails.

Next, UCC argues that it has been defamed. Before reaching
the substantive law on this counterclaim, the court must clarify
which statements properly are part of the defamation analysis.
The only publication on which UCC bases its defamation claim is a
letter sent to the members of the counterdefendant franchises.
However, UCC also alleges that a number of additional statements
were false or defamatory in the "factual" portions of its re-
sponse brief, including (1) the "inflammatory" material allegedly
distributed by Eng Lim during UCC's November 23, 1997 franchisee
conference, (2) letters from counterdefendants' counsel to UCC,
(3) the allegations of the original lawsuit, (4) letters to the
state attorney generals, and (5) comments made to the Wall Street
Journal. The majority of these statements cannot be considered
defamatory on their face.

First, the unauthenticated photograph of Eng Lim distribut-
ing material at the franchisee conference has been stricken from
the record. Second, the accusations of illegal activity con-
tained in the letters from the counterdefendants to UCC cannot be
defamatory because there is no evidence that these statements
were published to a third party. *See **Delval v. PPG Industries,
Inc***., 590 N.E.2d 1078, 1080-81 (Ind. App. 1992). Third, the
allegations in the complaint and other pleadings are absolutely

---

[2] The briefs filed on all these dispositive motions were voluminous, yet
another indication of the complexity of this case.

privileged. *See Miller v. Reinert*, 839 N.E.2d 731, 735 (Ind. App. 2006). The fact that UCC had an independent regulatory obligation to disclose the lawsuit in its Franchise Offering Circulars, and any financial impact of that disclosure, is both improper as a basis of liability and also completely irrelevant to the question of whether the counterdefendants' statements were defamatory. *See Woods v. Evansville Press Company, Inc.*, 791 F.2d 480, 483-84 (7th Cir. 1986). Third, the counterdefendants' letters to the state attorney general are protected petitioning activity in Indiana. *See*, *e.g.,* Ind. Code §4-6-9-4 (outlining the Indiana Attorney General's power to investigate written consumer complaints). Moreover, Indiana authorizes attorneys' fees against a party who files a claim objecting to a person's "act or omission . . . in furtherance of the person's right of petition or free speech." *See* I.C. §34-7-7-1 *et seq*. Although this statute applies to cases filed after July 1, 1998, it is strong evidence of Indiana's policy of protecting petitioning activity. *See, e.g., Shepard v. Shurz Communications, Inc*., 847 N.E.2d 219, 224-27 (Ind. App. 2006). Finally, the Wall Street Journal article both reports the allegations in the complaint and contains statements made by counterdefendant Mark Bledsoe and counterdefendants' counsel, Mario Herman. Because the pleadings are privileged, only the statements by Bledsoe and Herman may be considered. In sum, only these portions of the Wall Street Journal article and the statements contained in the member letters are proper bases for a defamation claim.

A defamatory statement is "that which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff." ***Poyser v. Peerless***, 775 N.E.2d 1101, 1106 (Ind. App. 2002)(*quoting* ***Davidson v. Perron***, 716 N.E.2d 29, 37 (Ind. App. 1999)). To state a claim for defamation, the plaintiff "must prove the existence of 'a communication with defamatory imputation, malice, publication, and damages.'" ***Trail v. Boys and Girls Club of Northwest Indiana***, 845 N.E.2d 130, 136 (Ind. 2006)(*quoting* ***Davidson***, 716 N.E.2d at 37). *See also* ***Poyser***, 775 N.E.2d at 1106. The communication is defamatory *per se* if it imputes "criminal conduct" or "misconduct in a person's trade, profession, office, or occupation," among other circumstances not relevant here. ***Trail***, 845 N.E.2d at 137. When the facts are not reasonably susceptible to more than one interpretation, the court may determine as a matter of law whether a statement is defamatory in light of its context. *See* ***Shepard***, 847 N.E.2d at 225; ***Poyser***, 775 N.E.2d at 1106.  Truth is a complete defense to a claim for defamation. *See* ***Trail***, 845 N.E.2d at 136; ***Shepard***, 847 N.E.2d at 225.

Regardless of whether the plaintiff is a public or private figure, the plaintiff must establish "actual malice" in matters of public or general concern in order to support a claim for defamation. *See* ***Shepard***, 847 N.E.2d at 224; ***Poyser***, 775 N.E.2d at 1107.  Whether a matter is of public concern generally is a question of law to "be determined by the content, form, and

17

context of a given statement, as revealed by the whole record." ***Connick v. Myers***, 461 U.S. 138, 147-48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). *See also* ***Journal-Gazette Company, Inc. v. Bandido's, Inc***., 712 N.E.2d 446, 452 n.7 (Ind. 1999). Actual malice exists when the defamatory statement is published "with knowledge that it was false or with reckless disregard of whether it was false or not." ***Poyser***, 775 N.E.2d at 1107 (internal quotation and citations omitted). To prove reckless disregard, "a plaintiff must designate sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." ***Ratcliff v. Barnes***, 750 N.E.2d 433, 537 (Ind. App. 2001) (internal quotation and citation omitted). The defendant's state of mind is critical to the court's inquiry, and "is a subjective fact that may be shown by indirect or circumstantial evidence." ***Poyser***, 775 N.E.2d at 1107. In the end, "[a]ctual malice must be shown by clear and convincing evidence." ***Poyser***, 775 N.E.2d at 1107. Furthermore, "[t]he question of whether there is sufficient evidence to support finding actual malice is a question of law for the court." ***Poyser***, 775 N.E.2d at 1107; ***Ratcliff***, 750 N.E.2d at 437. Under the "clear and convincing" standard, the court "must consider whether a reasonable factfinder could conclude that the plaintiff had sufficient evidence to meet that burden." ***McLaughlin v. State Farm Mutual Automobile Insurance Company***, 30 F.3d 861, 866 (7th Cir. 1994).

The member letter does not constitute defamation because it is entirely truthful. In the first paragraph, the letter states that the counterdefendant clubs filed suit against UCC on August 7, 1997 and that copies of the complaint had been filed with the state attorney general's office in the states where the clubs conducted business. This statement is true.

The second paragraph states, "Contained in the complaint are causes of action for fraud and violations of the Federal RICO statute, including an allegation that UCC is buying second quality products from sources other than direct from the manufacturers and adding markup to those prices." (UCC Exh. C) The complaint did contain those causes of action and allegations. UCC's disagreement with the substance of the complaint does not alter this fact. The second paragraph also states that the counterdefendants have made UCC and the state attorney general aware of their intent to rescind their franchise agreements. This statement is true, as shown by the letters Attorney Herman sent to UCC and the state attorney general. (See UCC Exh. A; Pl. Exh. 8) Similarly, the third paragraph states that UCC retaliated against the counterdefendants by unilaterally withholding "HUNDREDS OF THOUSANDS OF DOLLARS IN REVENUES AND ACCOUNTS RECEIVABLES DUE TO THE FRANCHISEES AS 'FUNDS HELD.'" UCC does not deny that it withheld funds following the filing of the counterdefendants' lawsuit, an act that UCC confirmed to the Wall Street Journal. (UCC Exh. F)

The last few paragraphs state that the franchisees will cease operation immediately, which did in fact occur, and lists a series of telephone numbers at UCC for members to call. A list of telephone numbers is not a statement susceptible to truth or falsity and so cannot be considered defamatory. *See **Milkovich v. Lorain Journal Company***, 491 U.S. 1, 21, 110 S.Ct. 2695, 2707, 111 L.Ed.2d 1 (1990). The letter then closes with:

> We painfully regret that UCC HAS CHOSEN TO TAKE THIS COURSE OF ACTION. We will work closely with our counsel to resolve our legal matters, and we work closely with each state's Attorney General's office to help you receive your merchandise and/or refunds and cease disruption of your membership privileges.

The phrase "course of action" reasonably can be construed as referencing only the decision to withhold funds and does not itself contain any defamatory implication. The remainder of this paragraph is little more than a statement of intent, rather than fact, and does not relate to UCC in any event. *See **Milkovich***, 491 U.S. at 21, 110 S.Ct. at 2707. Because every statement in the letter is either truthful or a statement not susceptible to a determination of truth or falsity, the letter cannot form a basis for UCC's defamation counterclaim.

Turning to the September 17, 1997 Wall Street Journal article, it is beyond dispute that allegations of wrongdoing by a company doing business with consumers in multiple states would be a matter of public concern. However, UCC has not shown by clear and convincing evidence that the statements made by Bledsoe and

20

Herman in this article were made with actual malice. The only quote from Herman is that he "estimates in an interview that the club has no more that 125,000 members, and a renewal rate of less than 50%." (UCC Exh. F) This statement closely tracks the allegations contained in the complaint filed one month prior, in which the counterdefendants state that "UCC did not and does not currently have 500,000 members" and "nowhere near 70% of UCC members renew their memberships." (DE 1, p. 65) There is no evidence that Herman made this statement—similar to and consistent with the allegations in a complaint that this court has determined did not constitute malicious prosecution—with knowledge that it was false or with reckless disregard for its truth or falsity. *See Poyser*, 775 N.E.2d at 1107. Acordingly, Herman's statement does not constitute defamation.

The second statement, from Bledsoe, is that "renewal rates were low because many members failed to achieve enough savings. 'Franchisees generate revenue, but very little goes to the bottom line.'" (UCC Exh. F) The first portion of this statement, if not the entire statement, is most accurately characterized as an opinion. *Woods*, 791 F.2d at 487 ("Statements of opinion, no matter how pernicious, are absolutely privileged under the first amendment."). In *Woods*, a television anchorman stated that the station's new owner did not support religious broadcasting for religion's sake, but rather because religious organizations paid the "going price" up front for their advertising. *See* 791 F.2d at 482-83. In reasoning that the statement was an opinion, the

Seventh Circuit noted that the anchorman's "comment is not objectively verifiable and read in context would not be under stood as a statement of fact by a reasonable reader." *Woods*, 791 F.2d at 487.

Likewise, Bledsoe's explanation of why renewal rates were low is not objectively verifiable, but merely is his opinion of why franchisee members might not renew. The subsequent portion of Bledsoe's statement, regarding the amount of income going towards the bottom line, also must be viewed in the context in which it was made. *See Connick*, 461 U.S. at 147-48, 103 S.Ct. at 1690. Bledsoe and Kellmark's claims in this litigation partially are based on Kellmark's failure to achieve the income allegedly prom-ised by UCC. (See DE 1, p. 45) There is no evidence that Bledsoe did not sincerely believe that his statement was true, based on his own personal experience.[3] Consequently UCC's defamation counterclaim fails as to the Wall Street Journal article as well.

As stated above, both the briefed and unbriefed "tortious inducement to breach" counterclaims rest on a common legal theory that each counterdefendant induced the breach of every other counterdefendant's agreements with UCC when seven clubs closed at

---

[3] The court notes that Bledsoe's letter to Herman, in which he states the counterdefendants "are also requesting complete authority to coordinate the timing and choice of media coverage and publicity as we deem necessary to protect the trust indenture," hardly is evidence of malice. A plaintiff to a public lawsuit has a right to request in advance that his counsel defer to him on media issues, particularly when the case is likely to generate significant publicity. (UCC Exh. E)

the same time.[4]  Therefore, the merits of the following counter-
claims are addressed below: 1) inducement to breach franchise
agreements; 2) inducement to breach personal guarantees; 3)
inducement to breach the Adolphi counterdefendants' promissory
note; 4) inducement to breach the franchisees' contractual
obligations to counterplaintiff Beta; and 5) inducement to breach
the written release of claims executed by TEC Associates.  In
addition, UCC's counterclaim that the counterdefendants induced
their members to breach their own contractual obligations to Beta
Finance, UCC's membership financing arm, also is premised on the
same theory.  While the members themselves are not counterdefend-
ants, their absence from this litigation is not material to the
court's analysis. For the following reasons, these claims fail.

As with the defamation counterclaim, a few preliminary
issues must be clarified before reaching the substance of UCC's
"inducement to breach" counterclaims.  First, it is undisputed
that UCC was not a party to the member agreements each club had
with its individual members.  Because UCC cannot assert a claim
for breach of a contract to which it is not a party, UCC cannot
assert a cause of action based on the member agreements. *See*
***Zemco Manufacturing, Inc. v. Navistar International Transporta-***
***tion Corporation***, 759 N.E.2d 239, 252 (Ind. App. 2002). Second,
"an officer or director of a corporation will not be held inde-
pendently personally liable for inducing the corporation's breach

---

[4] For the same reasons discussed previously in this opinion, UCC cannot
base its inducement counterclaim on the counterdefendants' petitioning
activity.  *See* **Shepard**, 847 N.E.2d at 224-227.

of its contract, if the officer or director's action is within the scope of his official duties on behalf of the corporation." **Martin v. Platt**, 386 N.E.2d 1026, 1027 (Ind. App. 1979). Thus, UCC cannot characterize the individual counterdefendants who made the decision to close their clubs as third parties who induced the breach of contracts between those clubs and UCC. *See* **Martin**, 386 N.E.2d at 1027.

In Indiana, the tort of "intentional interference with a contract," also called "inducement to breach," includes "any intentional, unjustified interference by third parties" with a contract. **Winkler v. V.G. Reed & Sons, Inc**., 638 N.E.2d 1228, 1234 (Ind. 1994). To establish tortious interference with a contractual relationship, the plaintiff must show "(1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach." **Winkler**, 638 N.E.2d at 1235 (*citing* **Daily v. Nau**, 339 N.E.2d 71, 76 n.6 (Ind. 1975)). The tort "evolved from judicial loathing of conspiracies in restraint of free enterprise by trade associations." **Winkler**, 638 N.E.2d at 1234. Although now applied to routine contract disputes, the typical fact pattern is when the defendant assists or encourages a party to the contract "to violate his contract with a third person *and to obtain the benefit of that contract for himself*." **Wade v. Culp**., 23 N.E.2d 615, 617 (Ind. App. 1939) (emphasis

24

added). *See also **Flintridge Station Associates v. American Fletcher Mortgage***, 761 F.2d 434, 441 (7th Cir. 1985) ("Flintridge must be able to show that the defendants acted with the purpose of interfering with the plaintiff's prospective economic advantage.")(internal citation and quotation omittted).

The concept of "justification" means "legal or social justification." ***Wade***, 23 N.E.2d at 617. *See also **Bilimoria Computer Systems, LLC, v. America Online, Inc***., 829 N.E.2d 150, 157 (Ind. App. 2005) ("The existence of a legitimate reason for the defendant's actions provides the necessary justification to avoid liability."). A determination of justifiability

> involves consideration of the following factors: (a) the nature of the defendant's conduct; (b) the defendant's motive; (c) the interests of the plaintiff with which the defendant's conduct interferes; (d) the interests sought to be advanced by the defendant; (e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff; (f) the proximity or remoteness of the defendant's conduct to the interference; and (g) the relations between the parties.

***Bilimoria***, 829 N.E.2d at 156.

The primary consideration in weighing these factors "is whether the defendants' conduct has been fair and reasonable under the circumstances." ***Winkler***, 638 N.E.2d at 1235. The absence of justification "is established only if the interferer acted intentionally, without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another." ***Bilimoria***, 829 N.E.2d at 156-57. *See also **Flintridge***,

25

761 F.2d at 441.

UCC's theory of liability for tortious inducement to breach simply does not fit the contours of the tort.  The facts of this case are that individuals and the franchises that they owned jointly filed suit to remedy perceived wrongs and made a business decision to breach their respective franchise agreements in light of what they perceived as the fraudulent inducement of those agreements at the agreements' formation.  (*See* UCC Exh. A)  There is no evidence that the club closures exclusively were directed at harming UCC, rather than staving off further financial losses.  Furthermore, "[e]ven if the breach is deliberate, it is not necessarily blameworthy." **Patton v. Mid-Continent Systems, Inc**., 841 F.2d 742, 750 (7th Cir. 1988) (Posner, Circuit Judge). If the plaintiffs had proven their case of fraudulent inducement, they would have been entitled to rescind their agreements without consequence. **Wade**, 23 N.E.2d at 617 (noting that legal justification negates the "unjustified" element of a tortious interference claim). Finally, there simply is no evidence that any counterdefendant benefitted in any way from the other counterdefendants', or from the members', contractual breaches. The court declines to treat joining together to file a lawsuit and fund this litigation as a "benefit" as contemplated by Indiana law. To hold otherwise would forever chill the ability of individual plaintiffs, themselves perhaps lacking the means to file suit, from joining together to litigate a common goal.  This is especially important where the defendant is a corporation with seemingly unlimited

assets.

In addition to the above "inducement to breach" counter-claims, all of which are based on the existence of a contract, UCC asserts a claim for interference with its advantageous relationships with the franchisees' members.  The court is unaware of any Indiana law recognizing this tort, which is premised on the concept that by closing down, the counterdefend-ant clubs interfered with UCC's anticipated stream of membership renewal royalties. Consequently, the court interprets the coun-terclaim as one for tortious interference with a business rela-tionship. To the extent UCC asserts a different cause of action, UCC may address the issue in the period provided for supplemental briefing.

Tortious interference with a business relationship has five elements: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages . . . ." *Rice v. Hulsey*, 829 N.E.2d 87, 91 (Ind. App. 2005). The cause of action is the same as that for tortious interference with a contract, "except there is no requirement that a valid contract exists." *Furno v. Citizens Insurance Company of America*, 590 N.E.2d 1137, 1140 (Ind. App. 1992). *See also* *Comfax Corporation v. North American Van Lines, Inc.*, 587 N.E.2d 118, 124 (Ind. App. 1992).  Tortious interference with a business relationship also "requires some independent illegal action." *Rice*, 829 N.E.2d at

91 (*quoting* **Brazauskas v. Fort Wayne-South Bend Diocese, Inc.**,
796 N.E.2d 286, 291 (Ind. 2003), *cert. denied*, 541 U.S. 902, 124
S.Ct. 1602, 158 L.Ed.2d 244 (2004)). Illegality in this context
"requires more blameworthy means be used than does interference
with contractual relations." *See* **Bradley v. Hall**, 720 N.E.2d 747,
751 n.3 (Ind. App. 1999). For example, neither defamation nor
pursuing an improper payment procedure at the request of a party
to the business relationship satisfies the illegal conduct
requirement. *See* **Autoxchange.com, Inc. v. Dreyer and Reinbold,
Inc.**, 816 N.E.2d 40, 52 (Ind. App. 2004); **Levee v. Beeching**, 729
N.E.2d 215, 222-23 (Ind. App. 2000).

It appears that UCC is attempting to turn an alleged loss
more accurately characterized as damages into an independent
cause of action for tortious interference with a business rela-
tionship. However, assuming that a valid business relationship
exists between UCC and the franchisees' members on the basis of
membership royalties, the counterclaim still fails for the same
reasons as did UCC's counterclaims for tortious interference with
a contractual relationship. In addition, UCC cannot establish
that the counterdefendants' actions were "illegal," as that term
is defined by the tort. This court has rejected all of UCC's
claims that the counterdefendants acted tortiously. The circular
argument that by closing the clubs the counterdefendants breached
their contracts, and by breaching their contracts the counterde-
fendants acted illegally, simply leads back to the same conclu-
sion that, for tort purposes, the counterdefendants' actions were

"justified." **Wade**, 23 N.E.2d at 617.  Therefore, this counter-claim fails.

UCC also claims that the counterdefendants interfered with UCC's prospective advantage with new franchisees and new members. This counterclaim is based on Eng Lim's alleged conduct at the November 23, 1997 franchising conference, the evidence of which has been stricken from the record. (Amended Counterclaim, p. 59) The claim also rests on UCC's obligation to disclose the lawsuit on UCC's Uniform Franchise Offering Circular. (Amended Counter-claim, p. 60).  Once again, this court will not punish the counterdefendants for UCC's independent regulatory obligation to disclose lawsuits filed against it and involving allegations of fraud.

Finally, UCC asserts several tort counterclaims in its amended answer that are not clearly discussed in its response to the motion for summary judgment (*See* Response, p. 3)(listing UCC's claims). For the sake of thoroughness, the court addresses them here. First, UCC made a claim for inducing counterdefendants T.A. Johnson/Fiveline Group, Inc.,Terry A. Johnson, Michael Laws, Alan Laws, Michele Laws, and Higher Dreams, Inc., to breach their contractual obligations to UCC.  On August 28, 2002, UCC stipu-lated to dismiss its counterclaims against these counterdefend-ants.  For that reason, and also pursuant to the court's analysis of UCC's "inducement to breach" claims set forth above, this claim fails. Second, UCC asserts a claim for inducement to default on payment of certain obligations due under the terms of

the franchise agreements, such as "merchandise accounts receiv-able, general bills, franchisee legislative fund, and certain unpaid royalties." (See DE 56, p. 52) The inducement claim fails for the reasons stated above. The remainder of this claim sounds in breach of contract. Last, UCC claims that the counterdefend-ants are jointly and severally liable for "thefts" of member money caused by breaches of various contracts that some counterdefendants had with UCC. Because all of UCC's tort claims fail, there can be no conspiracy, and thus no joint or several liability. *See Boyle*, 497 N.E.2d at 1079. The remainder of this claim, like the inducement to default claim, sounds in contract.

In sum, all of UCC's tort claims fail. However, the tort claims cannot be dismissed entirely on summary judgment because of the bankruptcy of Steven and Carrie Adolphi, discussed more fully below. With respect to the Adolphis only, these tort claims remain in the case but are stayed pending either the lifting of the stay or other appropriate disposition of the bankruptcy proceeding. Once the case may proceed against the Adolphis, the court will dispose of UCC's tort claims consistent with this opinion. Otherwise, because no conspiracy can be found, the court must dismiss those counterdefendants who have remained in this case solely under that theory. Thus, the Emancipation Trust, Thomas Callahan, Sr., Thomas Callahan, Jr., James Cochran, Monica Cochran, and Cochran Management Services must be dismissed entirely from this cause of action.

## 2. **Breach of Contract**

UCC asserts breach of contract claims for breaches of (1) member agreements between UCC and the franchisees' members; (2) personal guarantees signed by Eng Lim and Dennis Gain, Steven and Carrie Adolphi, and Mark and Kelly Bledsoe n/k/a Buckley; (3) Beta Finance Agreements signed by Eng Lim and Dennis Gain, Steven and Carrie Adolphi, and Mark and Kelly Bledsoe n/k/a Buckley; (4) the promissory note signed by Steven and Carrie Adolphi; (5) the franchise agreements between UCC and Persona Grata, S.A.C.A., and Kellmark; (6) the Beta Finance Agreements between UCC and Persona Grata, S.A.C.A., and Kellmark; and (7) the Franchise Agreement Assignment by TEC Associates.

UCC asserts that the counterdefendants have not briefed the claim for breach of the member agreements. (Response Brief, pp. 3-4) However, the counterdefendants have in fact done so. (Opening Brief, pp. 12-13) UCC is not a party to the agreements between the franchisees and their members, and UCC has not argued that it is a third-party beneficiary to these agreements. *See Midwestern Indemnity Company v. Systems Builders, Inc.*, 801 N.E.2d 661, 670 (Ind. App. 2004), *trans. denied*, 812 N.E.2d 804 (Ind. 2004). By failing to respond to the counterdefendants' motion for summary judgment on this claim, UCC has waived any arguments in its defense. *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990). *See also Dye v. United States*, 360 F.3d 744, 751 n.7 (7th Cir. 2004); *Hrowbowski v.*

*Worthington Steel Company*, 358 F.3d 473, 480 (7th Cir. 2004).

31

Therefore, this counterclaim fails.

Rather than brief the merits of the remaining six contract counterclaims, the counterdefendants raise a bankruptcy defense with respect to some claims. Counterdefendants Mark and Kelly Bledsoe n/k/a Buckley and Steven and Carrie Adolphi argue that their bankruptcies bar UCC from maintaining claims for breach of the personal guarantees, breach of the Beta financing agreements, and breach of the Adolphi's promissory note. However, these parties have not asserted discharge in bankruptcy as an affirmative defense. *See* Federal Rule of Civil Procedure 8(c). Because the Bledsoes were in Chapter Seven Bankruptcy, the Adolphis have filed a Chapter 13 Bankruptcy, and both the Bledsoes and Adolphis are at different stages in their bankruptcy proceedings, the court addresses these counterdefendants separately.

The Bledsoes filed for bankruptcy in the Western District of Washington on September 24, 1998, approximately one year after this case was filed. (Cause 98-12063 in U.S. Bankr. Ct. W.D. Wash.) On December 28, 1998, UCC timely instigated a separate adversary proceeding before the bankruptcy court by filing a "Complaint for Determination of Non-Dischargeability" pursuant to 11 U.S.C. §523(a)(6). (Cause A98-15800 in U.S. Bankr. Ct. W.D. Wash.) In UCC's adversary complaint, UCC asked the bankruptcy court to lift the court's automatic stay and also to stay adjudication of dischargeability until after this court had disposed of the counterclaims in this civil case. (UCC Exh. S) Two days later on December 30, 1998, the bankruptcy court issued a Discharge of

32

Debtor specifically exempting debts subject to dischargeability complaints that had not reached final disposition. (Pls. Exh. 11) On January 26, 1999, the bankruptcy court closed the bankruptcy proceeding. (UCC Exh. T, DE 7)  Back in the adversary proceeding, the parties filed a joint stipulation to pursue their claims in this court without violating the stay on March 19, 1999, which was granted on March 22, 1999. (Cause 98-15800, DE 8) Then, the bankruptcy court closed the adversary proceeding by remark on August 16, 1999. (Cause 98-15800)

Though a generally correct statement of the law, the Bledsoes' argument that "the closing or dismissal of a bankruptcy case generally results in the dismissal of pending adversary proceedings," simply does not supply the rule of decision here. (Reply Brief, p. 19)

A "dismissal" and a "closure" have different legal significance under the Bankruptcy Code.  *See* 11 U.S.C. §§349-350. *See also* ***In re Income Property Builders, Inc.***, 699 F.2d 963, 965 (9th Cir. 1983).  Section 349(a), addressing dismissals, states that "unless the court, for cause, orders otherwise, the dismissal of a case under this title does not bar the discharge, in a later case under this title, of debts that were dischargeable in the case dismissed." The legislative notes to this section clarify that § 349 applies only to those cases that were dismissed prior to discharge. *See* 1978 Acts, Revision Notes and Legislative Reports to 11 U.S.C.A. §349.  According to the notes, "the basic purpose of [subsection a] is to undo the bankruptcy case, as far

33

as practicable." *See* 1978 Acts. By contrast, §350 addresses the closure and reopening of a bankruptcy proceeding. Section 350(b) allows the case to be reopened "to administer assets, accord relief to the debtor, or for other cause." The advisory committee notes to Bankruptcy Rule 5010, which interprets §350, state that "[a] judgment determined to be non-dischargeable pursuant to Rule 4007 may be enforced after a case is closed . . . ." *See* Advisory Committee Notes to Rule 5010. Finally, Bankruptcy Rule 4007 governs the determination of dischargeability of a debt. According to the advisory committee notes to this Rule, an adversary proceeding need not be decided until after the court has made a determination of discharge in the bankruptcy proceeding. *See* advisory committee notes to Rule 4007. In sum, the bankruptcy rules explicitly contemplate that the decision in an adversary proceeding may follow the discharge of debtor in the bankruptcy proceeding.

The Ninth Circuit, in which the Bledsoes' bankruptcy case was filed, has stated that "the discharge of a debtor does not deprive the federal courts of jurisdiction over a claim 'related to' the bankruptcy." *In re Sasson*, 424 F.3d 864, 869 (9th Cir. 2005) (*citing In re Kieslich*, 258 F.3d 968, 971 (9th Cir. 2005), *cert. denied*, __ U.S.__, __ S. Ct.__, __ L.Ed.2d__, 2006 WL 653777 (2006). This jurisdiction "includes post-confirmation jurisdiction over state court actions such as breach of contract." *In re Sasson*, 424 F.3d at 869. The fact that a bankruptcy case has been "closed" without determination of final judgment

does not impact the bankruptcy court's ability to enter a new judgment on an adversary proceeding that has been closed, or to permit a later claim for nondischargeability after the bankruptcy proceeding has been closed.  *See, e.g., **In re Sasson***, 424 F.3d at 867; ***In re Staffer***, 306 F.3d 967, 971 (9th Cir. 2002).

All of the cases on which the Bledsoes rely to argue that closure of a case dictates dismissal of adversary proceedings actually address situations in which a bankruptcy case has been *dismissed* prior to discharge of debtor, rather than simply *closed* post-discharge.  *See, e.g., **In re Porges***, 44 F.3d 159, 162 (2nd Cir. 1995); ***In re Carraher***, 971 F.2d 327, 328 (9th Cir. 1992); ***Morris v. Fidelity & Deposit Company of Maryland***, 950 F.2d 1531, 1534 (11th Cir. 1992); ***Pauley v. Bank One Colorado Corp***., 205 B.R. 272, 274 (D. Colo. 1997); ***In re Roma Group, Inc***., 137 B.R. 148, 150 (S.D.N.Y. 1992); *Accord **Smith v. Commercial Banking Corp.***, 866 F.2d 576, 579 (3rd Cir. 1989).  In addition, all of these cases state that the "bankruptcy courts are not automatically divested of jurisdiction over related cases when the underlying bankruptcy case is dismissed," and discuss factors the court may apply, in its discretion, to determine whether retaining jurisdiction is appropriate.  ***In re Carraher***, 971 F.2d at 328. *See also, e.g.,  **In re Porges***, 44 F.3d at 162. The only case which extends the test articulated in ***Carraher*** and its companion cases to "dismissal or closing of a bankruptcy case" rests on cases applying the discretionary factors in the context of dismissal.  *See **In re Querner***, 7 F.3d 1199, 1201 (5th Cir. 1993).

35

*Querner* also cites *Smith*, in which the Third Circuit applied the discretionary test to determine whether jurisdiction is appropriate following discharge of debtor. *See* 866 F.2d at 579. This court declines to follow *Querner* and *Smith* to the extent these cases conflict with Ninth Circuit law, which governs the Bledsoes' bankruptcy.

It is apparent that neither the discharge of the debtor nor the closing of the Bledsoes' bankruptcy proceeding prohibit UCC from pursuing its claims. Likewise, the closing of the adversary pro- ceeding on August 18, 1999, is no bar to UCC's claims. *See In re Saber*, 264 F.3d 1317 (11th Cir. 2001). In *Saber*, the bankruptcy court denied cross-motions for summary judgment in an adversary proceeding, and then "closed" the case before issuing a final judgment. *See* 264 F.3d at 1321. In determining that no appeal could be taken, the Eleventh Circuit stated, "The fact that the court closed the adversary proceeding is of no moment; the court simply closed a pending case. Closure cannot transform an interlocutory order into a final judgment." *Saber*, 265 F.3d at 1324. This court agrees.

Here, the Bledsoes' discharge of debtor specifically exempted UCC's nondischargeability complaint. (Pl. Exh. 11) In turn, the nondischargeability complaint requested that the bankruptcy court defer ruling until the resolution of the civil case. (UCC Exh. S) The bankruptcy court has not issued a decision on the merits as to the dischargeability of UCC's claim, and so this claim remains pending. The fact that a discharge of debtor

has been issued and both the bankruptcy proceeding and adversary proceeding have been "closed" does not operate to bar UCC claims under Ninth Circuit law. *See* ***In re Sasson***, 424 F.3d at 869; ***In re Staffer*** 306 F.3d at 971. *See also* ***Saber***, 265 F.3d at 1324. The bankruptcy court likely is waiting to see if any claim survives in this civil case that may qualify for nondischargeability in bankruptcy and simply has closed the adversary proceeding for statistical purposes due to the length of this litigation. Therefore, bankruptcy is no defense to UCC's claims against the Bledsoes individually.

The Adolphis filed a Chapter 13 bankruptcy petition on October 14, 2005 in the Northern District of New York, which appears ongoing. (Pl. Exh. 12) Pursuant to this court's June 30, 2006 Order, the Adolphis recently submitted records showing that United Consumers Club, Inc. and United Consumers Club Franchising Corp. had been named as creditors in their bankruptcy petition. (DE 233) The Adolphis have not provided any evidence that Beta Finance and National Management, the other counter-plaintiffs in this case, are listed creditors. A failure to list these creditors may impact the dischargeability of the Adolphis' debts in the bankruptcy proceeding. *See* ***In re Massa***, 187 F.3d 292, 297-98 (2nd Cir. 1999). However, it does not enable this court to proceed with the claims of the unnamed counter-plaintiffs. *See* ***Carr v. McGriff***, 8 A.D.3d 420, 422 (N.Y. S.Ct. 2004) (finding that the trial court lacked jurisdiction pursuant to a stay, even when "[t]he plaintiffs were not listed as creditors in either of the

37

defendant's bankruptcy proceedings").  Thus, this case must be
stayed against the Adolphis.

Summary judgment cannot be granted on UCC's claims that
Kellmark Corporation, S.A.C.A, and Persona Grata breached their
franchise agreements and Beta finance agreements because the
parties disagree as to whether UCC first breached the agreements
by withholding funds, or whether the franchises first breached by
notifying their members of their intent to close and subsequent
closure. Resolution of this issue is for the trier of fact. *See*
***Remedytemp, Inc. v. Taylor***, No. Civ. A. 96-6778, 1998 WL 111806,
at *2 (E.D. Pa. Feb. 5, 1998).  However, the court still may
address the counterdefendants' arguments with respect to damages.

The parties dispute whether future royalties may be consid-
ered in a damages calculation for breach of the franchise agree-
ments. Pursuant to the choice of law provisions in the franchise
agreements for these clubs, New York law governs the Kellmark and
S.A.C.A. agreements and Rhode Island law governs the Persona
Grata agreement. *See **Allen***, 766 N.E.2d at 1162 ("Indiana choice
of law doctrine favors contractual stipulations as to governing
law."). Both of these states allow for lost future profits as an
element of contract damages if the profits can be calculated with
reasonable certainty. *See **Le Roi & Associates, Inc. v. Bryant***,
309 A.D.2d 1144, 1145 (N.Y.A.D. 2003) (finding that under New
York law, the plaintiff should have been awarded future profits
for the entire term of the contract because the profits "could be
calculated with reasonable certainty"); ***Sweet v. Pace Membership***

38

*Warehouse, Inc.,* 795 A.2d 524, 529 (R.I. 2002)(holding that under
Rhode Island law, "in order to recover future lost profits in an
action for breach of contract, a plaintiff must establish the
loss with reasonable certainty.").

Relying on California law, the counterdefendants argue that
future royalties would be speculative. *See **Postal Instant Press,
Inc. v. Sealy***, 43 Cal. App.4th 1704, 1709 (Cal. App. 1996). In
addition to being outside the relevant jurisdictions here, ***Sealy***
is totally inapposite to this case. In ***Sealy***, a franchisor termi-
nated the franchise agreement due to the franchisee's failure to
pay some past royalties and then sought both past and future
royalties as damages. *See* 43 Cal. App. 4th at 1706. The ***Sealy***
court rejected the franchisor's request for future royalties both
because such damages were proximately caused by the franchisor's
termination and because they were grossly oppressive/excessive
under the unique circumstances of the case. *See* 43 Cal. App.4th
at 1706. Here, the counterdefendant clubs closed; they did not
merely make late payments or fail to pay past-due royalties. As
with the question of who breached first, the counterdefendants'
arguments regarding proximate cause, reasonable certainty, and
mitigation present questions of fact.

Next, the counterdefendants assert that Federal Trade Com-
mission ("FTC") Rule 436 obligated UCC to disclose future royal-
ties as a category of damages in its Franchise Offering Circular.
*See* 16 C.F.R. §436. Thus, the counterdefendants argue, UCC's
failure to reference royalties explicitly precludes UCC from

39

pursuing royalties as a form of damages. First, the counterde-
fendants have not asserted an affirmative defense based on Rule
436, and so this defense has been waived. A party may not amend
his pleadings through arguments made in a brief on summary judg-
ment. *See* *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 606 (7th
Cir. 2000). Second, Rule 436 does not provide a private right of
action. *See generally* 16 C.F.R. §436.1. Third, the cases cited by
the counterdefendants permit a party to use a franchisor's
failure to comply with Rule 436 as evidence of fraud under state
law. *See, e.g., **Florida Auto Auction of Orlando, Inc. v. United
States*, 74 F.3d 498, 502 n.2 (4th Cir. 1996); *TC Tech Management
Company v. Geeks on Call America*, No. 2:03CV714, at 8 (E.D. Va.
March 24, 2004); *Rodopoulos v. Sam Piki Enterprises, Inc.*, 570
So.2d 661, 665 (Ala. 1990). Here, the counterdefendants have had
the opportunity to present their fraud claims and have lost.
They may not now relitigate the issue through the back door by
arguing that UCC may not receive categories of damages that
allegedly were fraudulently concealed on the Franchise Offering
Circulars.

In sum, the only breach of contract claim that fails is the
claim that S.A.C.A., Kellmark, and Persona Grata breached the
agreements UCC had with these franchisees' members. While the
other claims survive summary judgment, the court notes that the
parties have not clearly stated which counterplaintiffs and
counterdefendants are signatories to the remaining contracts at
issue. For example, it is not clear that National Management is

a proper counterplaintiff on any of the contracts remaining in this case.  However, the court will refrain from dismissing National Management until further clarification may be had.

### Conclusion

The only remaining counterdefendants in this case are Eng Lim, Dennis Gain, Steven and Carrie Adolphi, Mark and Kelly Bledsoe n/k/a Buckley, Persona Grata, S.A.C.A., Kellmark, and TEC Associates.  All tort claims are dismissed against all counterdefendants except Steven and Carrie Adolphi.  When the stay is lifted in the Adolphis' bankruptcy proceeding, this court will enter judgment on UCC's tort claims against the Adolphis consistent with this opinion. The remaining contract counterclaims in this case are the claims for breach of (1) personal guarantees signed by Eng Lim and Dennis Gain, Steven and Carrie Adolphi, and Mark and Kelly Bledsoe n/k/a Buckley; (2) Beta Finance Agreements signed by Eng Lim and Dennis Gain, Steven and Carrie Adolphi, and Mark and Kelly Bledsoe n/k/a Buckley; (3) the promissory note signed by Steven and Carrie Adolphi; (4) the franchise agreements between UCC and Persona Grata, S.A.C.A., and Kellmark; (5) the Beta Finance Agreements between UCC and Persona Grata, S.A.C.A., and Kellmark; and (6) the Franchise Agreement Assignment by TEC Associates.  The contract claims against the Adolphis are stayed.

―――――――――

For the foregoing reasons, the Motion for Summary Judgment filed by the counterdefendants, Mark Bledsoe et al., on February 22, 2006 is **GRANTED IN PART and DENIED IN PART**; the Motion to

Strike filed by the counter-plaintiffs known as UCC on April 29, 2006 is **GRANTED**; and the Motion to Strike contained within the counter-defendants' Reply Brief on May 27, 2006 is **GRANTED**. This cause is **STAYED** with respect to Steven and Carrie Adolphi only. Any supplemental briefing on the counterclaims for malicious prosecution, tortious interference with an advantageous relation-ship with club members, and tortious interference with a prospec-tive advantage with new franchisees and members shall be filed within 10 days of this Order. If no additional briefs are filed, the clerk shall enter judgment consistent with this Opinion and dismiss the Emancipation Trust, Thomas Callahan, Sr., Thomas Callahan, Jr., James Cochran, Monica Cochran, and Cochran Manage-ment Services as counter-defendants. No extensions of time will be granted.

ENTERED this 17th day of July, 2006

s/ ANDREW P. RODOVICH
United States Magistrate Judge