### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION

| | | |
|---|---|---|
| United Consumers Club, Inc., *et al.,* | ) | |
| | ) | |
| Counterplaintiffs | ) | |
| v. | ) | No. 2:97-CV-276 |
| | ) | Hon. Andrew P. Rodovich |
| Mark Bledsoe, *et al.,* | ) | |
| Counterdefendants | ) | |

### UCC'S SUPPLEMENTAL BRIEF
### IN OPPOSITION TO SUMMARY JUDGMENT ON THE COUNTERCLAIM

### *Sua Sponte* Summary Judgment Is Disfavored and Prejudicial

Counterdefendants filed a motion for partial summary judgment on limited issues; the Court *sua sponte* expanded counterdefendants' motion to cover and decide significant additional issues which the counterdefendants could have but did not raise. The Court has published its Opinion (2006 WL 2037378) that UCC cannot prevail on those issues and claims which no one raised or briefed, but has afforded UCC this opportunity to try to shake the Court's resolve.

Respectfully, such a procedure, where the Court decides issues entirely on its own, and only then invites the aggrieved party to attempt to change the Court's mind, is both unfair and improper and denies UCC a meaningful opportunity to present its position before the Court has reached a prejudgment. *See, Southern Illinois Riverboat Casino Cruises, Inc. v. Triangle Insulation and Sheet Metal Company,* 302 F.3d 667, 677-678 (7th Cir. 2002):

> In the past, we have held that *sua sponte* dismissals, in this
> case a decision granting summary judgment on a basis not
> argued by the parties, are hazardous for three reasons:  (1)
> they often conflict with the traditional adversarial precepts of
> our system of justice by tending to make the district court
> seem like a proponent of one side as opposed to a neutral
> decision-maker; (2) they may prejudice plaintiffs by
> depriving them of the opportunity to amend their complaint
> or to argue against dismissal; and (3) they tend to defeat the
> very purpose they are designed to serve–judicial efficiency.
> [Citations].  Therefore, as a general rule, 'a district court
> lacks the power to grant summary judgment *sua sponte* unless
> the party against whom summary judgment was entered had
> (1) proper notice that the district court was considering
> entering summary judgment, and (2) a fair opportunity to
> present evidence in opposition to the court's entry of
> summary judgment.'  [Citations].

*And see, R.J. Corman Derailment Services, LLC v. International Union of Operating Engineers, Local Union 150,* 335 F.3d 643, 650 (7th Cir. 2003)("our court has repeatedly explained that it is appropriate to grant summary judgment *sua sponte* only when it is clear that neither side will be disadvantaged or unfairly surprised by the move. [Citations].  We recently expressed our disfavor of this procedure", citing *Southern Illinois Riverboat, supra*).  Here, UCC is both unfairly surprised and severely disadvantaged by the Court's unfavorable adjudication of issues no one ever presented.

It is also well-established practice in the Seventh Circuit, which UCC followed in opposing counterdefendants' summary judgment motion, that "The party opposing summary judgment has no obligation to address grounds not stated in a motion for summary judgment."  *Pourghoraishi v. Flying J, Inc.,* 449 F.3d 751, 765 (7th Cir. 2006),

citing *Titran v. Ackman,* 893 F.2d 145, 148 (7th Cir. 1990):

> When a party moves for summary judgment on ground A, the
> opposing party need not address grounds B, C, and so on; the
> number of potential grounds for (and arguments against)
> summary judgment may be large, and litigation is costly
> enough without requiring parties to respond to issues that
> have not been raised on pain of forfeiting their position.

While the Court may be understandably anxious to bring this case to a final

conclusion, UCC has been unfairly prejudiced by the Court's unexpected and

unrequested *sua sponte* expansion of counterdefendants' limited motion for partial

summary judgment, and its virtual donning of the mantle of counterdefendants' counsel.

### **The Narrow Grounds Counterdefendants Presented for Summary Judgment**

In Counter-Defendants' Motion for Summary Judgment (Docket #220),

counterdefendants asserted only the following grounds for summary judgment (motion at

pp. 3-4):

- "UCC cannot prove a 'conspiracy,'"

- UCC "has no standing to bring certain claims,"

- UCC "cannot prove legally-cognizable damages", and

- Counterdefendants "have qualified privileges that are absolute
  defenses to claims of tortious inducement/interference, and libel."

In their brief in support of summary judgment (Docket #220), the

counterdefendants argued only the following grounds:

- The Emancipation Trust is not a "conspiracy" (mem. at 10-11);

-3-

- UCC was not a party to counterdefendants' membership agreements and therefore has no claim for breaches or inducing breaches of those agreements (mem. at 12-13);

- Counterdefendants were justified in inducing breaches of membership agreements and in communicating with the members (mem. at 14-15);

- UCC has no evidence that the counterdefendants induced each other to breach their franchise agreements (mem. at 15-16);

- UCC is not entitled to future royalties as damages (mem. at 16-24);

- Counterdefendants had a qualified privilege to disseminate defamatory communications among themselves, to their members, to each other's members, and to Attorneys General (mem. at 24-26);

- Bankruptcy proceedings insulate Bledsoe, Beckley and Adolfis from liability (mem. at 26-28).

UCC responded to those arguments in its opposition, but not to the host of other issues which counterdefendants' strategy led them not to raise.  As indicated above, UCC had no obligation to do anything further than that.

### Counterdefendants' Defamation of UCC

The only argument the counterdefendants raised as to defamation was qualified privilege.  UCC established in its response to that solitary argument (UCC mem. at 20-23) that summary judgment as to defamation was not warranted because genuine issues of material fact pervaded as to counterdefendants' abuse of privilege.  Qualified privilege was the only issue counterdefendants raised and it was the only issue UCC addressed, but the Court's Opinion does not even mention it.  Instead, without providing any notice or

meaningful opportunity[1] to respond, the Court took a completely different tack, addressing whether the communications in furtherance of the counterdefendants' conspiracy were defamatory or not.  The Court concluded that no defamation occurred, but the Court has erred.

At page 15 of the Opinion, the Court states that there is no evidence that the counterdefendants' defamatory letters were published to a third party, but at least the August 25, 1997 letter (UCC Summary Judgment Exhibit B) was published to third parties—it expressly states that "A copy of this letter has been forwarded to the Attorney General's office of each respective state."  Although the Court's Opinion notes that a letter to the Indiana Attorney General is "protected petitioning activity in Indiana", and even assuming—no one has argued it—that the same would hold true in New York, Rhode Island and the other States originally involved, neither the counterdefendants nor the Court explains why a report, for example, to the New York Attorney General by and on behalf of the Rhode Island franchisee, should qualify for immunity from defamation.

_____

[1]  This Court's Opinion and Order is dated July 17, 2006.  On July 24, 2006, UCC's counsel started a jury trial in an unrelated matter in the United States District Court in Chicago before the Honorable Matthew J. Kennelly which will not be completed until sometime during the week of July 31, 2006.  Because of that trial, UCC's counsel has had no chance until Saturday, July 29, 2006 to analyze this Court's July 17, 2006 Opinion or to draft this Supplemental Brief.  Inasmuch as the Court gave ten days (to July 31, 2006)—explicitly providing "No extensions of time will be granted"—for submitting this Supplemental Brief, UCC has realistically had almost no time to prepare this brief, to research the significant number of cases on which the Court relies, or to address the host of new issues which the Court, but not the counterdefendants, raised.

In addition, in concluding that the false Bledsoe and Mario Herman communications to the Wall Street Journal do not constitute defamation because they essentially track the allegations of the counterdefendants' complaint, which are absolutely privileged, the Court overlooks that no privilege protects the publication of the contents of a pleading to someone outside the litigation. *Associates Financial Services Co., Inc. v. Bowman, Heintz, Boscia & Vician PC,* 2001 WL 619381 at *9 (S.D.Ind. 2001)("the act of mailing the complaint to persons unrelated to the litigation is not protected by the absolute privilege....  [D]efendants cannot hide behind the protective shield of their complaint to disseminate defamatory statements about another."); *Biomet, Inc. v. Smith,* 238 F.Supp.2d 1036, 1047 (N.D.Ill. 2002)(Judge Sharp)("the statement was not covered by the same privilege when it was conveyed...outside the judicial proceeding."); *Asay v. Hallmark Cards, Inc.,* 594 F.2d 692, 698 (8th Cir. 1979)(if absolute privilege protected the external publication of a complaint, "to cause great harm and mischief a person need only file false and defamatory statements as judicial pleadings and then proceed to republish the defamation at will under the cloak of immunity.")  So to the extent that counterdefendants provided a copy of their complaint to the Wall Street Journal, the falsehoods in the complaint—questions of fact—lost their absolute immunity.  *But compare,* page 16 of the Opinion:  "Because the pleadings are privileged, only the statements by Bledsoe and Herman may be considered."  Since counterdefendants would not be privileged to produce their false complaint itself to the

press, they do no better by simply paraphrasing the false pleading instead of providing it *in haec verba. Compare,* Opinion at 20-22.  Nor did they enjoy a privilege when they conveyed the baseless allegations of their complaint to the members.  *Compare,* Opinion at 19.  The allegations in the complaint of UCC "buying second quality products...and adding markup" were entirely false, and while counterdefendants were privileged to plead that falsity in Court, they enjoyed no similar privilege when they published those allegations in their letter to the members.  That was actionable defamation *per se.*

### <u>The Court, Not the Counterdefendants, Raises "Actual Malice" for the First Time</u>

For the first time in the history of this case, the Court's Opinion (at 17-18) also imposes on UCC (a privately held corporation) the burden of proving "actual malice" in order to establish defamation—a burden for which the counterdefendants have never contended.  First of all, whether the allegations made by a handful of unsuccessful franchisees about their perceived reasons for failing in their particular franchises is a matter of public or general concern (Opinion at 17) depends entirely on context, which UCC has not been given an opportunity to address.  It begs the question (Opinion at 23, n.3) for the Court to conclude that the business failures of this small group of franchisees became a matter of public concern for the very reason that counterdefendants publicized their false allegations to the media.  *Hutchinson v. Proxmire,* 443 U.S. 111, 135 (1979) ("Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.")  It would also vest far too much power

-7-

in a defamer to permit him, by widely publishing his defamatory materials, to elevate the

defamed party-victim's burden of proof to "actual malice" by "clear and convincing

evidence".[2] *Ibid.*

Secondly, the counterdefendants made most, if not all of their allegations with

absolutely no basis in fact; *i.e.,* "maliciously".  Trying desperately to find fault with UCC

at every turn, they simply jumped to unfounded conclusions unsupported by any

evidence.  The "second-quality products" and "mark-up" allegations are the most

immediate examples.  *And see,* the attached Exhibit A:  deposition excerpts of Eng Lim

and Lim deposition exhibits 5 and 6.  Those deposition exhibits are false, derisive,

franchisee morale-busting pieces which Lim circulated to all of UCC's franchisees either

with knowledge of the falsity of the matters stated or at best recklessly disregarding

whether they were true or not.[3]  The Court should not grant summary judgment on the

defamation claims.

---

[2]  The Court also usurps the jury's province (Opinion at 20-21) when it concludes that "UCC has not shown by clear and convincing evidence" that Bledsoe acted with actual malice. UCC has evidence that the counterdefendants lacked a basis for their false statements; no more is required to meet UCC's summary judgment burden.  *See,e.g.,* Bledsoe deposition excerpts attached as Exhibit B.

[3]  Lim circulated these two publications in March, 1997, prior to the formation of the counterdefendants' conspiracy at the May, 1997 meeting with Mario Herman near Washington, D.C.  So while the Lim pieces would not appear to be part of the conspiracy *per se,* they are nevertheless defamatory and actionable against Eng Lim individually, independent of the other defamation committed during the conspiracy, but counterdefendants did not move for summary judgment on any non-conspiracy-related claims.

## UCC's Tortious Interference Claims

With respect to tortious interference with contract, the Court erroneously concludes (Opinion at 26) that "There is no evidence that the club closures exclusively were directed at harming UCC, rather than staving off further losses."  Taking the totality of the counterdefendants' concerted, unified, lock-step conduct into consideration, there is indeed evidence from which the jury could conclude that harming UCC was the counterdefendants' exclusive purpose—but that is for the jury, not the Court, to decide. Moreover, even if it were true beyond any genuine issue of material fact (which it is not) that each of the counterdefendants shut down its own operations to prevent financial losses to itself, counterdefendants have not explained how it is even remotely conceivable that a New York franchisee's inducement of a Rhode Island franchisee to close its Rhode Island location could somehow save the New York franchisee from any losses in the operation of the New York location.  The New York franchisee would forestall no losses by the Rhode Island closure, and would have no purpose for inducing the Rhode Island closure except to inflict damage on UCC.  Finally, the Court incorrectly expands the elements of tortious interference with contract as stated by the Indiana Supreme Court in *Winkler v. Reed,* by engrafting a law-review quotation taken from a 1939 Indiana appellate court case (Opinion at 24), and adding not just that the tortious interference damage the claimant, but also that the defendant must have profited from the induced contract breach.  That "benefit" element is simply not an element of this tort in Indiana.  *See, Winkler v. Reed,* 638 N.E.2d at 1235.

Similarly, even though the counterdefendants have never mentioned it, the Court also imposes on UCC's tortious interference with business relationship claims, the requirement of proving "illegal conduct".  Opinion at 27-28.  Once again, however, the Court disregards that "filing a lawsuit for improper reasons" may satisfy the "illegal conduct" requirement.  *Associates Financial Services Co., Inc. v. Bowman, Heintz, Boscia & Vician PC,* 2001 WL 619381 at *8 (S.D.Ind. 2001); *Reginald Martin Agency, Inc. v. Conseco Medical Insurance Co.,* 388 F.Supp.2d 919, 931 (S.D.Ind. 2005) ("Indiana case law provides little guidance on what constitutes illegal conduct for purposes of establishing a tortious interference with a business relationship claim.... [C]ourts have identified non-criminal acts that may satisfy the illegal conduct element", citing *Associates Financial, supra,* for the principle that "filing a lawsuit for alleged improper reasons, as well as alleged intimidation and exertion of economic duress, could amount to illegal conduct.")  Here, UCC has amply demonstrated the concerted, orchestrated campaign of the counterdefendants to file a false, overblown and since-dismissed lawsuit, to run to the press, to close their franchises in unison, to bombard the Attorneys General, and to cut their members loose with only UCC to turn to.  The jury could easily find that counterdefendants intended by that firestorm of attack on UCC to scare, intimidate and coerce UCC.  Such misconduct squarely fits the "illegal conduct" element of the tortious interference with business relationship claims, as the case-law above has applied it.

-10-

The Court also bestows undue shelter on the counterdefendants by reason of UCC's Offering Circular disclosure obligations. Opinion at 29. To prove tortious interference with business relationships, UCC must show the jury that counterdefendants knew of UCC's relationships with its franchisees and the members and that counterdefendants intentionally interfered with those relationships. Opinion at 27. Represented by an experienced franchise-law specialist, and themselves aware of the contents of their own Offering Circulars, the jury is entitled to conclude that counterdefendants fully intended that however groundless, UCC would have to disclose the counterdefendants' lawsuit in future Offering Circulars. That UCC has disclosure obligations is not a form of punishment to the counterdefendants, as the Court apparently perceives. Opinion at 29. Rather, the disclosure obligation demonstrates the counterdefendants' intent, since they knew as the night follows the day that their baseless fraud claim would coerce UCC to reveal the specious charges against it in all its future Offering Circulars. Summary judgment on the tortious interference with business relationship claim, once again, is inappropriate.

Finally, the Court raises a number of UCC's claims, which, the Court comments, "are not clearly discussed" in UCC's summary judgment opposition. Opinion at 29. But the counterdefendants did not make any of these claims part of their motion for summary judgment. UCC therefore had no obligation to respond with respect to those claims at all—there was nothing to respond to. Once again, however, the Court *sua sponte* injects

-11-

those claims into an adverse summary judgment ruling to which UCC has had no opportunity to respond. It is true that when UCC stipulated to dismiss the claims of two franchisees (Opinion at 29), it dropped its claims against those two franchisees; however, it simply does not follow that the remaining counterdefendants were *ipso facto* absolved from their liability to UCC for inducing those dismissed franchisees' breaches of obligations. A party can settle with one who breached a contract without giving up separate tort claims against a third party which induced the contract breach. The Court's ruling otherwise is incorrect.

### Counterdefendants' Baseless Complaint Constituted Malicious Prosecution

With regard to malicious prosecution, the Court gives too much credit to the inartful scrivening of the complaint. Opinion at 12-15. While this Court did not originally accept UCC's arguments for dismissal of the RICO claims, UCC made the same lack-of-enterprise arguments for dismissing RICO in the *Stachon* case as it had made in this Court, based on the then very recently-decided case of *Fitzgerald v. Chrysler Corp.,* 116 F.3d 225 (7th Cir. 1997). That this Court gave the plaintiffs greater lenity, most probably because of the turgid prolixity of plaintiffs' pleading in this case, than did the Chicago district court in *Stachon,* only delayed the inevitable dismissal of the plaintiffs' RICO claims, which were unsustainable as a matter of law when filed, as the Court ultimately determined.

-12-

The Court's further observation that it originally dismissed only one of plaintiffs' numerous state law claims (Opinion at 14) also fails to ratify the legal substance of plaintiffs' theories, because the Court's reason for leaving the other state law claims pending was not that those claims had any legal substance, but rather that they required choice-of-law analysis which had not been provided at that point.  The Court also takes no points away from counterdefendants for later dropping the rest of their state-law claims, but if those claims had had any legal or factual substance, plaintiffs would never have let them go.

The Court further declines to fault plaintiffs for suing not just as the franchisee entities but also as individuals, and does not consider the stipulated dismissal of the individual plaintiffs as a "favorable termination" for malicious prosecution purposes. But the stipulated dismissal of the individuals for lack of standing came only after UCC had threatened a motion to dismiss for obvious lack of standing and sanctions if the individuals did not remove themselves from the litigation.  Considering the "context in which the proceedings were terminated" yields further evidence of entirely baseless claims against UCC.

Lastly, the Court brushes off the dismissal of the Cochran franchisee on statute of limitations grounds as not being an adjudication on the merits.  But the dismissal was involuntary and therefore adjudicated the merits.  Fed.R.Civ.P. 41(b).  Moreover, a plaintiff which files a stale, time-barred claim, years too late to meet the statute of

-13-

limitations has no "probable cause" for its suit.  Nor were the Cochrans mere tag-alongs

to the conspiracy, having contributed at least $20,000 to the cause.  *See,* attached J.T.

Cochran deposition excerpts attached as Exhibit C.  Likewise, the Callahan franchisee

(whose dismissal the Court's Opinion does not mention) was dismissed because it had

signed a written release of all the claims that it then filed against UCC.  The Callahan

franchisee clearly lacked any basis or any probable cause for its suit, but the Court makes

nothing of that.  The counterdefendants' original suit thus lacked any probable cause.

That it lingered in discovery before finally being dispatched attests only to the

imperfections of our pretrial process which permits discovery to proceed even on

meritless claims.  It is no testament to any merit in the counterdefendants' position.  The

claims were not merely "weak" (Opinion at 13), they were entirely untenable, as has

proved to be the case.  Not a single claim made it to a jury; all were dismissed in one way

or another.  Summary judgment *sua sponte* on the malicious prosecution claim is

therefore improper.

### Counterdefendants Engaged in a Conspiracy

Accordingly, the Court has acted erroneously, preemptively, prematurely and

largely *sua sponte* to dismiss UCC's defamation, tortious interference and malicious

prosecution claims.  The Court did not address, let alone reject, UCC's demonstration of

sufficient direct and circumstantial evidence for the jury to find knowing, concerted,

conspiratorial conduct on counterdefendants' part.  The Court relied instead on a

mistaken and largely uninvited and unbriefed rejection of the vitality of all of UCC's tort

-14-

claims.  For the reasons stated above, those tort claims should not be summarily adjudicated out of this case, but rather should go to the jury for determination.  By the same token, the jury should decide on the evidence that the counterdefendants unlawfully conspired in violation of Indiana law to inflict willful and malicious damage on UCC. The counterdefendants' unlawful, tortious means to an unlawful end constitute a conspiracy, and UCC is entitled to have the jury award it the damages the conspiracy caused.

<u>**Conclusion**</u>

The Court's expansive but *sua sponte* treatment of counterdefendants' deliberately limited motion for summary judgment has unfairly surprised and prejudiced UCC, depriving UCC of a meaningful opportunity to address the numerous, complex issues the Court has simultaneously raised and decided against UCC in one fall of the axe.  Still, the Court has misperceived the facts and overlooked important legal principles on the way to dismissing UCC's conspiracy claim.  UCC's evidence cries out that the counterdefendants engaged in willful concerted conduct to inflict malicious harm on UCC.  Summary judgment on conspiracy and the underlying tort claims is simply not warranted, and the counterdefendants' motion for summary judgment on the counterclaim should be denied.

Law Office of C. Joseph Yast
Willow Hill Executive Center
540 Frontage Road, Suite 2110
Northfield, IL  60093-1224
Phone:  847/441-0357                       /s/ C. Joseph Yast
Fax:  847/441-0359                                    C. Joseph Yast, Attorney for
Email:  JoeYastLaw@comcast.net                        Counterplaintiffs

## CERTIFICATE OF SERVICE

    I hereby certify that on July 30, 2006, I electronically filed the foregoing UCC Supplemental Brief in Opposition to Summary Judgment on the Countereclaim with the Clerk of the Court using the CM/ECF system which sent notification of such filing to Mario L. Herman:  mherman@franchise-law.com

/s/ C. Joseph Yast