UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION


| | |
|---|---|
| UNITED CONSUMERS CLUB, INC., ) | |
| UNITED CONSUMERS CLUB ) | |
| FRANCHISING CORPORATION, BETA ) | |
| FINANCING COMPANY, and ) | |
| NATIONAL MANAGEMENT ) | |
| CORPORATION, ) | |
| ) | |
| Counterplaintiffs, ) | |
| ) | |
| v. ) | Case No.  2:97 CV 276 |
| ) | |
| ) | |
| MARK BLEDSOE, KELLY BLEDSOE ) | |
| n/k/a BUCKLEY, KELLMARK ) | |
| CORPORATION d/b/a/ United ) | |
| Consumers Clubu of Buffalo, ) | |
| New York, ENG LIM, DENNIS ) | |
| GAIN, PERSONA GRATA NORTH ) | |
| AMERICA d/b/a United Consumers ) | |
| Club of Providence, Rhode ) | |
| Island, STEVEN ADOLPHI, CARRIE ) | |
| ADOLPHI, S.A.C.A., INC., d/b/a ) | |
| United Consumers Club of ) | |
| Syracuse, Rhode Island, THOMAS ) | |
| CALLAHAN, SR., THOMAS CALLAHAN,) | |
| JR., TEC ASSOCIATES d/b/a ) | |
| United Consumers Club of ) | |
| Baltimore, Mariland, JAMES ) | |
| COCHRAN, MONICA COCHRAN, ) | |
| COCHRAN MANAGEMENT SERVICES ) | |
| d/b/a United Consumers Club of ) | |
| Ann Arbor, Michigan, and the ) | |
| EMANCIPATION TRUST, ) | |
| ) | |
| Counterdefendants ) | |


OPINION and ORDER

    This matter is before the court on the Supplemental Brief in

Opposition to Summary Judgment filed by the counterplaintiffs,

United Consumers Club, Inc., et al. (collectively "UCC") on July

30, 2006.  For the following reasons, the July 17, 2006 Order is **AFFIRMED** and summary judgment is **ENTERED** consistent with that opinion except for with respect to the defamation claim.  The Order is **AFFIRMED IN PART** and **REVERSED IN PART** on the defamation claim as set forth below.

<u>Background</u>

After nine years of litigation, the only remaining claim in this case is an expansive counterclaim alleging that 10 of the original 15 individual plaintiffs, five of the original eight corporate plaintiffs, and the plaintiffs' litigation-funding mechanism "the Emancipation Trust" committed a broad range of offenses when certain UCC clubs closed and the original plaintiffs filed this lawsuit. The court incorporates the facts as stated in the July 17, 2006 Opinion and Order.

On February 22, 2006, the counterdefendants filed a motion for summary judgment.  In response, UCC claimed that the motion only sought "partial" summary judgment and clarified that the UCC counterclaim in fact asserted 20 causes of action:

> 1) Conspiracy to inflict malicious damage on the counterplaintiffs through a series of unlawful acts; 2) Breaches of franchise agreements, 3)personal guarantees, and 4) member agreements; 5) Inducing breaches of franchise agreements, 6) personal guarantees, and 7) member agreements; 8) Breach of the Adolfis' Promissory Note and 9) inducing that breach; 10) Defamation *per se*; 11) Interference with advantageous relationships with franchisees' members, 12) with prospective new franchisees and 13) with prospective new members; 14) Interference with the rights of Beta Finance to collect financed membership fees from members; 15) Breaches of contrac-

2

tual obligations to Beta Finance; 16) Induc-
ing breaches of contractual obligations to
Beta Finance; 17) Breach of the written re-
lease of claims executed by TEC Associates,
Inc.; 18) Inducing breach of the written
release of claims executed by TEC Associates,
Inc.; 19) Malicious prosecution; and 20)
Conspiracy maliciously to prosecute baseless
claims against the counterplaintiffs.

(MSJ Resp. Brief, p. 3)

Of this list, UCC argued that the counterdefendants failed to
brief the counterclaims "numbered 3-4, 6-9, or 12-19 above" and
thus, summary judgment could not be entered on these counter-
claims. (MSJ Resp. Brief, p. 4) Finally, on July 10, 2006, UCC
clarified the breach of contract counterclaims against the
remaining counterdefendants upon request of this court. (DE 230,
232)

In the July 17 Order granting in part and denying in part
summary judgment, this court found that all of UCC's counter-
claims for breach of contract survived except the counterclaim
that the counterdefendants breached agreements UCC had with club
members. (July 17, 2006 Order, p. 40)  The counterdefendants had
moved for summary judgment on this point.  (MSJ Brief, pp. 12-13)
While UCC claimed in its response brief that this counterclaim
should survive, UCC did not provide any analysis in support of
its assertion and did not include an objection to entry of
summary judgment on this counterclaim in UCC's supplemental
brief. (MSJ Brief, pp. 12-13; MSJ Resp. Brief, pp. 3-4; July 17,
2006 Order pp. 23-24) In addition, neither side has objected to
the court's finding that all other breach of contract counter-

3

claims survived. Accordingly, the court's rulings on the breach of contract counterclaims are affirmed.

The only counterclaims now available for discussion are those sounding in tort.  In the July 17 Order, this court recognized that "the facts underlying UCC's conspiracy counterclaim, and the torts UCC alleges were committed by the conspiring counterdefendants, are so interrelated that the interests of justice require the court to address all of the tort counterclaims," despite UCC's allegation that some of these claims survived for failure to brief. (July 17, 2006 Order, pp. 9-10) Thus, this court addressed all of UCC's tort claims in the July 17 Order, but granted both sides an opportunity to address any unbriefed claims prior to the entry of judgment. (July 17, 2006 Order, pp. 41-42)  UCC timely filed a supplemental brief with objections on July 30, 2006.  These objections are now before the court.

<u>Discussion</u>

## I.   The Appropriateness of Summary Judgment

The Supreme Court has noted that "district courts are widely acknowledged to possess the power to enter judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all her evidence." ***Celotex Corporation v. Catrett***, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1996). *See also* ***Aviles v. Cornell Forge Company***, 183 F.3d 598, 604 (7th Cir. 1999). The Seventh Circuit consistently has held that despite their disfavor, a district court does not abuse its

4

discretion by granting summary judgment *sua sponte* provided that "the party against whom the summary judgment was entered had (1) proper notice that the district court was considering entering summary judgment, and (2) a fair opportunity to present evidence in opposition to the court's entry of summary judgment." ***Southern Illinois Riverboat Casino Cruises, Inc. v. Triangle Insulation and Sheet Metal Company***, 302 F.3d 667, 678 (7th Cir. 2003). *See also **Pourghoraishi v. Flying J., Inc.***, 449 F.3d 751, 765 (7th Cir. 2006).  As in the case of fully briefed issues, summary judgment may not be granted *sua sponte* if genuine material facts exist.  *See **Jones v. Union Pacific Railroad Company***, 302 F.3d 735, 740 (7th Cir. 2002); ***Aviles***, 183 F.3d at 604-05; ***Goldstein v. Fidelity and Guaranty Insurance Underwriters, Inc.***, 86 F.3d 749, 750 (7th Cir. 1996). Finally, the "notice" requirement obligates the court to notify the parties of the bases for the court's ruling, not merely that summary judgment is being enter-tained. *See **R.J. Corman Derailment Services, LLC v. International Union of Operating Engineers, Local Union 150***, 335 F.3d 643, 650 (7th Cir. 2003).

Here, the counterdefendants sought summary judgment on what they presumably thought was the entirety of UCC's amended coun-terclaim:  the seven substantive complaints in the amended counterclaim and the damages alleged therein.  (*Compare* Amended Counterclaim pp. 52-63 *to* MSJ, pg. 3 *and* MSJ Brief, pp. 16-24) UCC expanded these substantive claims to 20 "theories" (really counterclaims) of relief in their response brief, claiming that

summary judgment could not be granted on any unbriefed counter-
claims and arguing that the counterdefendants would have learned
the expansive nature of UCC's counterclaims had the counterdefen-
dants propounded contention interrogatories or reviewed the
allegations contained in a motion to sever for trial filed in
2004. (MSJ Resp. Brief, pp. 3-4 and n.1) To further complicate
matters, many of the unbriefed counterclaims rested on common
themes also significant to briefed counterclaims, and many of the
arguments raised by the parties could not be addressed accurately
without reaching those unbriefed or partially briefed themes.

Given the length of this litigation and the general confu-
sion summarized above, this court ordered UCC to clarify its
breach of contract counterclaims and then entered a 42 page order
fully setting forth the evidence and law underpinning the dispo-
sition of all 20 "theories" of relief.  The court then withheld
entry of judgment and invited the parties to provide supplemental
briefing within 10 days, the length of time contemplated by
Federal Rule of Civil Procedure 59(e) for the filing of motions
to alter or amend judgment.  Finally, the court reconsiders its
previous order here in light of the objections raised by UCC in
its supplemental brief.  Under these circumstances, the court
believes it has provided UCC with notice and an opportunity to be
heard.

## II. Tortious Inducement/Interference

Although UCC claimed "conspiracy" as an independent counter-
claim in its response to the motion for summary judgment, UCC

6

does not dispute that conspiracy hinges on the presence of an underlying tort and does not itself constitute an independent cause of action.  (MSJ Resp., p. 3; July 17, 2006 Order, pp. 10-12) Thus, UCC's 13 tort counterclaims really boil down to four theories of relief: 1) inducement to breach the franchise agreements, personal guarantees, member agreements, contractual obligations of both the counterdefendants and current members to Beta finance, Adolfi promissory note, and TEC written release of claims; 2) interference with UCC's advantageous relationships with franchisees' existing members and with prospective new franchisees and members; 3) Defamation *per se*; and 4) malicious prosecution. (*See* July 17, 2006 Order p. 23) The court addresses the two tortious inducement/interference theories here.

First, UCC has not objected in its supplemental briefing to this court's conclusion that UCC may not maintain a counterclaim for tortious interference with agreements between individual franchises and their members when UCC was not a party to those contracts.  *See **Zemco Manufacturing, Inc. v. Navistar International Transportation Corporation***, 759 N.E.2d 239, 252 (Ind. App. 2002)(holding that summary judgment is appropriate on an interference claim when the plaintiff was not a party to the underlying contract).  Therefore, summary judgment may be affirmed on this counterclaim without further discussion.

Second, it is undisputed that all of the tortious inducement/interference counterclaims "rest on a common legal theory that each counterdefendant induced the breach of every other

7

counterdefendant's agreements with UCC when seven clubs closed at the same time." (July 17, 2006 Order, pp. 22-23) The material facts with respect to these claims also are not in dispute: seven franchises closed at approximately the same time in 1997. These franchises, their owners, and other franchises/owners jointly (1) hired a lawyer, (2) filed a lawsuit, (3) established the Emancipation Trust to fund the litigation, (4) communicated their desire to coordinate timing and choice of media coverage of the litigation as necessary, (5) sent letters to UCC regarding their dissatisfaction, (6) sent letters to the attorneys general in the states in which the seven franchises operated, and (7) sent letters to their members stating the allegations in the complaint, the franchises' decisions to close, and referring the members to UCC. (July 17, 2006 Order, pp. 5-7) Moreover, this theory was fully briefed on summary judgment both in the context of UCC's conspiracy theory of relief, which encompasses a "conspiracy" to influence one another to act, and in the counterdefendants' contention that they were justified in acting. (MSJ Brief, pp. 2-8, 9-16; MSJ Resp. Brief, pp. 4-14; Reply Brief pp. 2-9) In light of this fact, UCC's supplemental briefing on the tortious inducement/interference claims sound as a motion to reconsider a claim on which UCC already has had the opportunity to present evidence and legal argument. *Frietsch v. Refco, Inc.*, 56 F.3d 825 (7th Cir. 1995)("It is not the purpose of allowing

motions for reconsideration to enable a party to complete pre-

8

senting his case after the court has ruled against him.").

Nevertheless, UCC first argues that the court inappropri-
ately usurped the fact-finding role of the jury because a reason-
able person could infer from the above facts that the counterde-
fendants intended to induce each other to breach their contracts
with UCC. (Supp. Brief, p. 9) The problem for UCC is that this
court found, as a matter of law, that UCC's theory "simply does
not fit the contours of the tort" in Indiana. (July 17, 2006
Order, p. 26) UCC has not cited any law in either its original
briefs or the supplemental brief which supports its contention
that two parties may be liable for inducement to breach each
others' contracts with a third party by jointly closing, filing
suit, and otherwise acting as these counterdefendants have done
here. As previously stated, "If the plaintiffs had proven their
case of fraudulent inducement, they would have been entitled to
rescind their agreements without consequence." (July 17, 2006
Order, p. 26)  The court will not reiterate further the reasoning
in the July 17 Order for rejecting UCC's theory except to note
that a contrary holding would blur the lines between conspiracy,
which does not constitute a separate cause of action, and the
tort of inducement to breach a contract.

Next, UCC argues that

> the Court incorrectly expands the elements of
> tortious interference with contract as stated
> by the Indiana Supreme Court in ***Winkler v.***
> ***Reed***, [638 N.E.2d 1228, (Ind. 1994)] by en-
> grafting a law-review quotation taken from a
> 1939 Indiana appellate court case . . . and
> adding not just that the tortious interfer-

> ence damage the claimant, but also that the
> defendant must have profited from the induced
> contract breach.  That "benefit" element is
> simply not an element of this tort in Indi-
> ana.

(Supp. Brief, p. 9)

In *Winkler*, the plaintiff argued that his former employer, Typoservice, its president, and the company that purchased Typoservice, tortiously interfered with his employment contract with Typoservice.  *See* 638 N.E.2d at 1234. The Indiana Supreme Court rejected Typoservice's argument that it could not be held liable for tortiously interfering with its own contract.  *See Winkler*, 638 N.E.2d at 1234 n.7. In so holding, the court cited to *Wade v. Culp*, 23 N.E.2d 615, 617 (Ind. 1939), the 1939 opinion disparaged by UCC.[1]  The *Wade* court, in turn, quoted American Jurisprudence (Second) for the proposition that "[a] person who, by conspiring with another or by collusive agreement with him, assists him to violate his contract with a third person *and to obtain the benefit of that contract for himself* commits an actionable wrong." 23 N.E.2d at 617 (citation and internal quotation omitted) (emphasis added).  *See also Flintridge Station Associates v. American Fletcher Mortgage*, 761 F.2d 434, 441 (7th Cir. 1985).  As illustrated by both *Wade* and *Winkler*, the theory behind an inducement claim is that a party intentionally and wrongfully has "interfered with an economic advantage" in the sense of obtaining some economic benefit of a contract.  Jointly

---

[1] *Wade*, which was denied transfer by the Indiana Supreme Court, remains good law.  *See Winkler*, 638 N.E.2d at 1234 n.7.

10

closing shop and filing a lawsuit over the reasons for that
closure does not fit the tort.

In addition, the only evidence offered by UCC to show that
the counterdefendants "maliciously and exclusively" intended to
take the benefit of or otherwise interfere with UCC's economic
advantage is the fact that the counterdefendants took joint
action. (MSJ Resp. Brief, pp. 13-15); *Bilimoria Computer Systems,
LLC v. America Online, Inc.*, 829 N.E.2d 150, 157 (Ind. App.
2005).  Moreover, that joint action involved protected petition-
ing activity, privileged communications between the counterdefen-
dants and their attorney, and communications with the closed
franchises' members regarding the reasons for the club closures
and how to contact UCC directly.  In the July 17 Order, this
court declined "to treat joining together to file a lawsuit and
fund this litigation as a 'benefit' as contemplated by Indiana
law." (July 17, 2006 Order, p. 26) Put another way, this court
declines to treat conspiracy as an independent tort.

UCC acknowledges in its supplemental brief that its claims
for "interference with its advantageous relationship with the
franchisees' members" really are claims for tortious interference
with a business relationship. (Supp. Brief, p. 10; July 17, 2006
Order, pp. 27-28)  However, UCC suggests that the court inappro-
priately imposed "a requirement of proving 'illegal conduct'"
onto the tort. (Supp. Brief, p. 10) The Indiana Supreme Court has
held that "some independent illegal action" is necessary to
support a claim for interference with a business relationship.

11

*See* ***Brazauskas v. Fort Wayne-South Bend Diocese, Inc.***, 796 N.E.2d 286, 291 (Ind. 2003). *See also* ***Osler Institute, Inc. v. Forde***, 333 F.3d 832, 839 (7th Cir. 2003). This element must be pled. *See* ***Associates Financial Services Company, Inc. v. Bowman, Heintz, Boscia & Vician P.C.,*** No. IP99-1725-C-M/S, 2001 WL 619381, at *8 (S.D. Ind. April 25, 2001). Accordingly, UCC's argument fails.

UCC further argues that "'filing a lawsuit for improper reasons' may satisfy the 'illegal conduct' requirement" of a tortious interference with a business relationship claim. (Supp. Brief, p. 10) In the briefing on summary judgment, UCC characterized the business relationship at issue as UCC's anticipation of royalties from the renewed membership contracts that individual franchisees held with their members. (MSJ Resp. Brief, p. 11) After being given the opportunity to expand upon its contentions through supplemental briefing, UCC states generally that the conduct at issue as "the concerted, orchestrated campaign of the counterdefendants to file a false, overblown and since-dismissed lawsuit, to run to the press, to close their franchises in unison, to bombard the Attorneys General, and to cut their members loose with only UCC to turn to." (Supp. Brief, p. 10)

No state law cases and only two cases from within the Seventh Circuit, both from the Southern District of Indiana, have touched on the concept of a lawsuit as fulfilling the "illegal conduct" requirement. *See* ***Reginald Martin Agency, Inc. v. Conseco Medical Insurance Company***, 388 F.Supp.2d 919, 930-31 (S.D. Ind.

12

2005); *Associates Financial Services*, 2001 WL 619381, at *8. In *Reginald Martin,* an insurance company simultaneously exited the major medical insurance market in 15 states and terminated the sales agreements that the company held with many field agents. *See* 388 F.Supp.2d at 923. The court recognized that tortious interference with a business relationship "involves the interven-tion of a third party and will not lie against a party to the contract" and also that every affected business relationship involved a contract between someone and the defendant company because the company had a contract with each party in the insur-ance distribution chain. *See Reginald Martin*, 388 F.Supp.2d at 930-31 (*quoting Keith v. Mendus*, 661 N.E.2d 26, 36 (Ind. App. 1996)). Notwithstanding this arrangement, the court concluded that "it is possible that . . . the Plaintiffs had business relationships with the sub-producers outside that which included [the company]." *Reginald Martin*, 388 F.Supp.2d at 930-31.

Even assuming that this court agrees with *Reginald Martin* that UCC has standing to sue for tortious interference of a business relationship when each club holds separate agreements with UCC and with the club's members (and assuming still further that UCC has produced evidence of a relationship with the club members <u>outside</u> any of the contracts already at issue this case), *Reginald Martin* says nothing as to whether filing a lawsuit can constitute illegal conduct. *See* 388 F.Supp.2d at 931-32. The only reference the case makes to the proposition is in a string cite to *Associates Financial Services*, cited for the proposition

that illegal conduct is not limited to that which is criminal. *See **Reginald Martin***, 388 F.Supp.2d at 931-32. Then, in an unpublished decision, the ***Associates Financial Services*** court declined to dismiss a tortious interference with a business relationship claim under Federal Rule of Civil Procedure 12(b)(6). The court simply noted that "it is difficult to tell from the limited facts whether Associates' alleged conduct was sufficient to be considered 'illegal.'" *See **Associates Financial Services***, 2001 WL 619381, at *8. Thus, while one court outside the controlling jurisdiction was willing to entertain the possibility that filing a lawsuit might be considered "illegal conduct" at an early stage in the litigation, no court has held definitively that it does. This court declines to do so on the facts of this case.

Unlike ***Associates Financial Services***, the litigation in this case has been proceeding for nine years.  The parties have had ample time to develop the facts and present evidence of their claims.  However, the evidence UCC offers in support of its claim is that the counterdefendants took joint action to file and fund a lawsuit. Even if the counterdefendants' communications with the state attorneys' general, the club members, and the Wall Street Journal were defamatory, defamation does not constitute illegal conduct as contemplated by the tort. *See **Levee v. Beeching***, 729 N.E.2d 215, 222-23 (Ind. App. 2000). In the end, UCC's interference claim rests on the fact that joint action was taken.  But conspiracy is not the same as interference with a business relationship.  As noted in the July 17 Order, "It appears that UCC is

14

attempting to turn an alleged loss more accurately characterized
as damages into an independent cause of action."

UCC argues that the court bestows "undue shelter on the
counterdefendants by reason of UCC's Offering Circular disclosure
obligations." (Supp. Brief, p. 11) It is undisputed that UCC has
an "independent regulatory obligation to disclose lawsuits filed
against it and involving allegations of fraud." (July 17, 2006
Order, p. 29) UCC argues that  malicious intent can be inferred
by the counterdefendants' representation by a franchise law
specialist and by the fact that the counterdefendants read their
own Offering Circulars, which presumably disclosed any other
lawsuits involving fraud at the time the counterdefendants became
franchisees.  (Supp. Brief, p. 11) This argument stretches the
limits of circumstantial evidence beyond all permissible ground,
particularly given that many of the counterdefendants read their
Offering Circulars years before this lawsuit was filed.

Finally, UCC makes no effort to clarify or present any law
on the claims this court found UCC to assert "in its amended
answer that are not clearly discussed in its response to the
motion for summary judgment." (July 17, 2006 Order, p. 29)
Rather, UCC briefly argues that the these claims, all based on
the same theory of inducement to breach discussed above, should
survive even though UCC dismissed the breach of contract counter-
claims against certain parties. (Supp. Brief, p. 12)  The court's
prior opinion does not constitute an error of logic.  If UCC
dismissed its claims based on contracts held with franchise A,

15

then UCC cannot sue on those contracts.  If the court further
rejects the theory on which UCC bases its counterclaim that
franchise A induced franchise B to breach B's contract with UCC,
then the inducement claim against franchise A must fail as well.

For the reasons set forth above, the July 17 Order with
respect to the inducement to breach/interference with a business
relationship claims is affirmed. The only remaining tort claims,
malicious prosecution and defamation, are discussed below.

### III.  Malicious Prosecution

UCC cites no law and does not allege that the facts are in
dispute with respect to its malicious prosecution claim. (Supp.
Brief, pp. 12-14) Instead, UCC disputes the court's conclusions
with respect to the legal merit of this case, arguing that
because no issue survived for a jury trial, *sua sponte* summary
judgment was improper on this claim. (Supp. Brief, p. 14) UCC
also points to the Cochran plaintiffs, who had been added as
parties in the amended complaint and then dismissed on summary
judgment under the statute of limitations.[2] In addition, UCC
argues that the Callahan plaintiffs were dismissed on summary
judgment because they signed a written release of claims. (Supp.
Brief, pp. 13-14)  Finally, UCC does not cite any additional
evidence in support of the malicious prosecution claim in its

---

[2] UCC correctly notes that this court erred in stating that "some claims
were dismissed based on the statute of limitations, not on the merits."  (July
17, 2006 Order, p. 14) Although involuntary dismissal is an adjudication on
the merits under Federal Rule of Civil Procedure 41, the court's misstatement
in the July 17, 2006 Order does not alter the result for the reasons set forth
above.

supplemental brief, but has attached excerpts from the deposition
of countedefendant Mark Bledsoe. (Supp. Brief, Exh. B) In that
deposition, Bledsoe admits that he had no personal basis for
alleging that UCC marks up the price of the merchandise sold. He
further states that the claim UCC sells defective or second
quality merchandise to its members is based on "at least 75
percent" of the orders he placed involved defective merchandise
and because

> UCC has set up a system by not purchasing
> direct from the manufacturer, and not having
> the systems in place to monitor the products
> that the manufacturers distribute through
> UCC, that their omission has created an ave-
> nue for members to get second quality prod-
> ucts, and/or defects, and/or refurbished,
> and/or irregulars, and/or rejects.

>  (Bledsoe Dep., ps. 61-62, 71)

Bledsoe believed the merchandise was not sold at cost because he
thought UCC used a "middle man" to buy merchandise other than
direct from the manufacturer. (Bledsoe Dep. pp. 72-75)  For the
following reasons, UCC's argument that the malicious prosecution
claim should survive sets the bar too high. *See **Mirka v. Fair-
field of America, Inc.***, 627 N.E.2d 449, 452 n.5 (Ind. App. 1994)
(holding that a plaintiff is not liable for malicious prosecution
merely for filing a weak case).

   As this court noted in the July 17 Order, the only issues in
dispute are whether the counterdefendants acted with malice and
without probable cause in filing this lawsuit. (July 17, 2006
Order, pg. 12) Probable cause exists "when a reasonably intelli-

17

gent and prudent person would be induced to act as did the person who is charged with the burden of having probable cause." *City of New Haven v. Reichhart*, 748 N.E.2d 374, 379 (Ind. 2001). The court herein incorporates the remainder of the law set forth in the July 17 Order. (*See* pp. 12-15)

The length of proceedings in this case is not due to the scope of relevant discovery, but rather the complicated nature of the legal issues. The primary claims in this case were for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and fraudulent misrepresentation of facts.  All three of these claims survived a motion to dismiss on substantive grounds. Then, only through a change in the law, this court dismissed the RICO claims. (July 17, 2006 Order, pp. 2-3)  While UCC argues that this court's ruling "only delayed the inevitable dismissal of the plaintiff's RICO claims" until the Seventh Circuit clarified the law on RICO, Indiana precedent is clear that a plaintiff has probable cause to file a lawsuit when the law is unsettled at the time a lawsuit is commenced. (Supp. Brief, p. 12)  *See* *Willsey v. Peoples Federal Savings and Loan Association of East Chicago*, 529 N.E.2d 1199, 1206 (Ind. App. 1998); *The Board of Commissioners of Hendricks County v. King*, 441 N.E.2d 506, 509 (Ind. App. 1985). Finally, after two rounds of summary judgments in which the court further narrowed the fraud claims, one fraud claim still survived for trial.  The fact that the court directed a verdict on this issue at the close of the plaintiffs' evidence does not automatically mean that prose-

cution was malicious. *See **Willsey**,* 529 N.E.2d at 1205-06 (finding
no malicious prosecution when the original suit was dismissed on
summary judgment). There is no requirement under Indiana law that
a case reach a jury before the plaintiff is safe from liability
for malicious prosecution.

The court did not have the opportunity to reach the remain-
ing claims in any dispositive motions.  Despite the court's
finding that the state law claims for negligent misrepresentation
and breach of the implied covenant of fair dealing survived dis-
missal for failure to brief a conflict of laws issue, the plain-
tiffs voluntarily dismissed these claims with their amended
complaint early in the litigation.  (July 17, 2006 Order, p. 3)
Some plaintiffs later stipulated to dismiss their claims--as UCC
also agreed to dismiss all of their counterclaims against them.
(DE 152 ¶ 1) UCC argues that the stipulations came "only after
UCC had threatened a motion to dismiss for obvious lack of
standing and sanctions if the individuals did not remove them-
selves from the litigation." (Supp. Brief, p. 13) However, this
court will not find probable cause for malicious prosecution when
the only communication before the court was a mutual dismissal of
all claims, which would include a dismissal of any malicious
prosecution claim against the counterdefendants named in the
stipulation.

The manner in which the Cochran and Callahan plaintiffs left
the original lawsuit also does not support an inference of mali-
cious prosecution.  The court's conclusion that the Cochrans were

19

barred by the statute of limitations required an extensive factual analysis in which the court determined when a reasonable person would have been aware of a claim against UCC. (DE 139, pp. 15-18) With respect to the Callahan plaintiffs, the court first rejected UCC's contention that the contractual limitations clause in the franchise agreement barred these plaintiffs' claims.  In so holding, the court resolved a *bona fide* dispute between the parties as to whether the fraud claims arose out of the franchise contract.  (DE 139, pp. 7-12)  However, the court found that the individual Callahan plaintiffs lacked standing to sue because the franchise the Callahans ran was owned by TEC Associates, Inc. rather than the Callahans personally, and the Callahans had not argued that their claims fell within any exception to the general rule barring individual suits to redress corporate injuries.  (DE 139, pp. 18-19) The court further held that the claims of TEC Associates were barred by the release of claims after finding that under Maryland law, the broad language of the release pre-vented TEC Associates from suing on future claims. (DE 139, pp. 19-21)  In sum, while the Callahan and Cochran claims were weak, they were not so weak as to be resolved without discussion or consideration of the evidence.

Finally, UCC has not cited any law for the proposition that a court must consider each allegation, rather than the totality of the litigation, in determining whether a defendant has engaged in malicious prosecution. It is common in litigation, particular-ly in a case as broad as this one, that a plaintiff asserts

20

allegations of varying strength and credibility.  Thus, Bledsoe's inconsistent testimony that he both believed UCC sold items at higher cost due to the use of a "middle man" but also had no personal basis for his belief is no more than a scintilla of evidence that legal arguments and substantive allegations contained in the 70 page amended complaint were made without probable cause. *See Mirka*, 627 N.E.2d at 449, 452 n.5 (negligent failure to investigate the factual bases for a claim does not constitute malicious prosecution).  This court concurs with *Mirka* that "there are sufficient avenues already in existence for dealing with frivolous and vexatious lawsuits." *See* 627 N.E.2d at 452.

## IV.  Defamation

It is undisputed that allegations in court pleadings are absolutely privileged. *See Miller v. Reinert*, 839 N.E.2d 731, 735 (Ind. App. 2006).  UCC's primary argument in support of its defamation claim is that the following statements exceeded the protections of this privilege when the counterdefendants published them to third parties: (1) an August 25, 1997 letter from the counterdefendants to UCC, copies of which were sent to the state attorneys general; (2) publication of certain allegations of the complaint in the Wall Street Journal; (3) Bledsoe's statements to the Wall Street Journal; (4) the statements of Mario Herman, counterdefendants' counsel, to the Wall Street Journal; and (5) statements in letters sent to the members of the affected franchises that "[c]ontained in the complaint are causes of action for fraud and violations of the Federal RICO statute, including

21

an allegation that UCC is buying second quality products from
sources other than direct from the manufacturers and adding
markup to those prices." (Supp. Brief, pp. 5-7)  In essence, UCC
seeks a ruling on the qualified privilege argument raised by the
counterdefendants in their motion for summary judgment.

UCC's allegations with respect to the August 25, 1997 letter
fail without reference to the qualified privilege. Truth is a
complete defense to a defamation claim.  *See **Trail v. Boys and
Girls Club of Northwest Indiana***, 845 N.E.2d 130, 136 (Ind. 2006).
The only characterization of UCC's actions in these letters is
the truthful and undisputed allegation that UCC withheld funds,
which the counterdefendants call a "retaliatory and illegal
course of action." The counterdefendants further assert that UCC
was in "breach of contract and fiduciary duties." (UCC MSJ Resp.
Exh. B) The counterdefendants' position that UCC acted in a
retaliatory, illegal manner and breached their contracts and
fiduciary duties simply states their legal position and is more
fairly described as an opinion. *See **Woods v. Evansville Press
Company, Inc.***, 791 F.2d 480, 487 (7th Cir. 1986). The letter
contains no specific allegations with respect to UCC beyond the
truthful statement that UCC withheld funds.  In any event, this
court has held that communication with the attorneys general on
the subject of consumer complaints is protected petitioning
activity in the State of Indiana. (July 17, 2006 Order, p. 16)
Given UCC's position that Indiana law applies to the tort claims
in this case, UCC cannot now suggest that petitioning laws in New

22

York, Rhode Island, or the other states involved are somehow
relevant to whether defamation has occurred in Indiana. (Supp.
Brief, p. 5; MSJ Resp. Brief, p. 4)  The fact that the letters
sent to each attorney general mentioned the suits in the other
states also is irrelevant for the above reasons.

Likewise, the court need not decide whether Bledsoe's
statements to the Wall Street Journal fall under the qualified
"common interest" privilege. *See **Board of School Commissioners
of City of Indianapolis v. Pettigrew**,* 851 N.E.2d 326, 331 (Ind.
App. 2006) ("The privilege exists because of the 'necessity for
full and unrestricted communication on matters in which the
parties have a common interest or duty.'") (citation omitted).
*See also **Biomet, Inc. v. Smith***, 238 F.Supp.2d 1036, 1047 (S.D.
Ind. 2002)("Whether a privilege applies is a question of law for
the court to decide."). The July 17 Order held that Bledsoe's
statements were his opinion, which is absolutely privileged under
the First Amendment, regardless of whether the statements also
fall under another privilege. (Order, p 21)  UCC has not ob-
jected to this holding.

This court must reconsider its ruling on the remaining
statements in the Wall Street Journal article.  Although state-
ments in pleadings are absolutely privileged, the privilege is
lost when the pleadings are communicated to the media or other
third party without interest in the litigation. *See **Asay v.
Hallmark Cards, Inc.***, 594 F.2d 692, 697-98 (8th Cir. 1979);
***Associates Financial Services***, 2001 WL 619381, at *9; ***Biomet***, 238

23

F.Supp.2d at 1047. Thus, the counterdefendants cannot claim
privilege with respect to statements:

> . . . According to the suit, UCC overstates
> its membership and the renewal rate, and
> exaggerates the savings that members can get.
>
> Mario L. Herman, a Washington attorney for
> the plaintiffs, estimates in an interview
> that the club has no more than 125,000 mem-
> bers, and a renewal rate of less than 50%.
>
> (UCC Exh. C)

Consequently, the court must determine whether these statements
were defamatory.

A defamatory statement is "that which tends to injure the
reputation or to diminish esteem, respect, good will, or confi-
dence in the plaintiff, or to excite derogatory feelings or
opinions about the plaintiff." *Poyser v. Peerless*, 775 N.E.2d
1101, 1106 (Ind. App. 2002) (*quoting Davidson v. Perron*, 716
N.E.2d 29, 37 (Ind. App. 1999)). As noted in the July 17 Order,
"the communication is defamatory *per se* if it imputes 'criminal
conduct' or 'misconduct in a person's trade, profession, office,
or occupation,' among other circumstances not relevant here."
(Order, p. 17)  The communication is defamation *per quod* "if the
defamatory character of the statement is not apparent on its
face, and extrinsic facts are required to explain its defamatory
meaning." *Kolegas v. Heftel Broadcasting Corporation*, 607 N.E.2d
201, 206 (Ill. 1992). As a preliminary question, "the determina-
tion of whether a communication is defamatory is a question of
law for the courts, and 'the allegedly defamatory words are to be

24

construed in light of the circumstances of their utterance.'"
*Shepard v. Shurz Communications, Inc.*, 847 N.E.2d 219, 225 (Ind.
App. 2006)(*quoting* *Rambo v. Cohen*, 587 N.E.2d 140, 145 (Ind. App.
1992)). Finally, "[i]f the words are ambiguous so that it is
possible to construe both a defamatory and non-defamatory mean-
ing, then the case should properly go to the jury." *Jacobs v.
City of Columbus Police Department*, 454 N.E.2d 1253, 1264 (Ind.
App. 1983).

Although UCC claims defamation *per se*, the comments quoted
above are no more than defamation *per quod*. The allegations at
issue are that (1) UCC has fewer members, (2) UCC has a lower
membership renewal rate, and (3) members do not achieve the
stated savings.  None of these allegations suggests criminal or
business misconduct.  Rather, the defamatory imputation comes in
the suggestion that UCC <u>lied</u> about membership, renewal rates, and
savings.  Accordingly, a jury must determine whether, at least
with respect to the unquoted statements, the counterdefendants
uttered the statements or whether the Wall Street Journal inde-
pendently discovered the complaint (which was a matter of public
record) and published its contentions.  A jury also must deter-
mine whether the counterdefendants knew the allegation that UCC
lied about these three statements was false and determine dam-
ages. *See* Introductory Comment on Libel and Slander: Instructing
the Jury on Defamation Per Se and Per Quod, *Ind. Pattern Jury
Instruction-Civil* 35-5.

Next, UCC argues that the "common interest privilege" does

25

not protect the counterdefendants from a defamation *per se* claim
based on the allegation that "UCC is buying second quality
products from sources other than direct from the manufacturers
and adding markup to those prices" (Supp. Brief, p. 7)  The
"common interest" privilege is a qualified privilege which
"applies to communications made in good faith on any subject
matter in which the party making the communication has an inter-
est or in reference to which he has a duty, either public or
private, either legal, moral, or social, if made to a person
having a corresponding interest or duty." ***Schrader v. Eli Lilly
and Company***, 639 N.E.2d 258, 262 (Ind. 1994). The privilege is
lost when "(1) the communicator was primarily motivated by ill
will in making the statement; (2) there was excessive publication
of the defamatory statements; or (3) the statement was made
without belief or grounds for belief in its truth." ***Schrader***, 639
N.E.2d at 262.

Regardless of whether the franchise members had a common
interest in the counterdefendants' lawsuit, UCC has produced
evidence creating a question of material fact as to whether the
second quality products/markup allegation was made with a belief
or grounds for belief in its truth. As noted earlier, Bledsoe
first states that he has no basis for this statement, but then
claims that the statement was based on his belief that UCC
employed a "middle man." (Bledsoe Dep., pp. 61-62, 72) A jury

must determine the basis for the allegation, and its reasonable-

26

ness, in light of Bledsoe's testimony.

Attached to its supplemental brief, UCC includes two documents Eng Lim admits to have sent to all U.C.C. franchisees several months before this suit was filed. (Eng Lim Dep., p. 163, Exh. 5, 6)  One document is an "anonymous" six page letter to UCC making a series of allegations and complaints about UCC which Lim admits to be based on his guestimate, personal belief, "joke," or own club experience.  (Eng Lim Dep., pp. 161-68,  Exh. 6) The other document is titled "Franchisees that Went Poof! Or Failed Since 199?" (Eng Lim Dep, Exh. 5)  Although these documents cannot be attributed to the remaining counterdefendants because Eng Lim mailed them on his own months before the franchisees closed and filed suit, the mailings still may support a defamation claim against him personally.  Because the parties have not briefed this aspect of the case, it must survive summary judgment.

UCC argues that the court applied the wrong standard in holding that UCC must establish "actual malice" for the defamation claims because it is a private entity. (Supp. Brief, p. 7) However, the court did not utilize the actual malice requirement because the court allegedly considered UCC a public figure, but because the subject matter of this action was a matter of general or public concern inasmuch as UCC by its own admission has over 500,000 members in a multitude of states. Under Indiana law, both public and private figures must establish actual malice in order to bring a defamation claim on a matter of public concern. *See Shepard*, 847 N.E.2d at 224 *(quoting Journal-Gazette Company v.*

27

*Bandido's, Inc*., 712 N.E.2d 446, 449 (Ind. 1999), *cert. denied*, 528 U.S. 1005, 120 S.Ct. 499, 145 L.Ed.2d 385 (1999)) ("[T]he actual malice standard of proof required in defamation cases involving matters of public or general concern applies not only to public figures, but to private individuals as well."). Whether an issue is of public concern is a question of law. *See **Bandido's***, 712 N.E.2d at 452 n.7. The court's decision on that point had nothing whatsoever to do with the counterdefendants' use of the media.

Finally, UCC has stated that this court is "understandably anxious to bring this case to a final conclusion" (Supp. Brief, p. 3) and that this court "acted erroneously, preemptively, prematurely, and largely *sua sponte*" (Supp. Brief, p. 14) in its July 17 Order. However, this criticism overlooks the problems of submitting this case to the jury without addressing all of the issues raised in the counterclaim.

This matter currently is set for trial on September 18, 2006, and the parties will be required to submit proposed jury instructions.  After the close of UCC's evidence, the counterdefendants undoubtedly will move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  The issues addressed *sua sponte* in the July 17 Order are issues which would have had to be addressed at trial if they had not been included in the summary judgment order.

In order to efficiently manage the trial, including determining the admissability of evidence, it was determined that

28

these issues should be resolved prior to jury selection and not during the trial itself. UCC has been given the opportunity to address all of these issues and cannot claim prejudice because some of the issues were dismissed before, rather than during, the trial.

_____

For the foregoing reasons, the July 17 Order is **AFFIRMED** and summary judgment is **ENTERED** consistent with that opinion except for with respect to the defamation claim. The Order is **AFFIRMED IN PART** and **REVERSED IN PART** on the defamation claim. The July 17, 2006 Order is **AMENDED** to show that the following counter-claims remain in this case:

> 1) Breach of Franchise Agreements and Beta Finance Agreements against Persona Grata North America, Inc., S.A.C.A., Inc., and Kellmark Corporation;
>
> 2) Breach of the Franchise Agreement Assignment by TEC Associates;
>
> 3) Breach of Personal Guarantees and Beta Finance Agreements by Eng Lim and Dennis Gain, Steven and Carrie Adolfi, and Mark and Kelly Bledsoe n/k/a Beckley. This claim is **STAYED** with respect to the Adolfis only.
>
> 4) Conspiracy to commit defamation *per quod* based on the allegation that UCC lied about membership, renewal rates, and savings as stated in the Wall Street Journal article. This claim survives against all counterdefendants named in the caption of this Order and is **STAYED** against the Adolfis only.
>
> 5) Conspiracy to commit defamation *per se* based on the statement that UCC is buy-

ing second quality products from sources
other than direct from the manufacturers
and adding markup to those prices, con-
tained in the letter to Club members and
is **STAYED** against the Adolfis only.

6)   Defamation by Eng Lim personally based
on the two documents he mailed to all
UCC franchisees, attached as Exh. A to
UCC's supplemental brief.

ENTERED this 14th day of August, 2006

                              s/ ANDREW P. RODOVICH
                                 United States Magistrate Judge