UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION


| | |
|---|---|
| UNITED CONSUMERS CLUB, INC., ) | |
| UNITED CONSUMERS CLUB ) | |
| FRANCHISING CORPORATION, BETA ) | |
| FINANCING COMPANY, and ) | |
| NATIONAL MANAGEMENT ) | |
| CORPORATION, ) | |
| ) | |
|       Counterplaintiffs, ) | |
| ) | |
|       v. ) | Case No.  2:97 cv 276 |
| ) | |
| MARK BLEDSOE, KELLY BLEDSOE ) | |
| n/k/a BECKLEY, KELLMARK ) | |
| CORPORATION d/b/a/ United ) | |
| Consumers Club of Buffalo, ) | |
| New York, ENG LIM, DENNIS ) | |
| GAIN, PERSONA GRATA NORTH ) | |
| AMERICA d/b/a United Consumers ) | |
| Club of Providence, Rhode ) | |
| Island, STEVEN ADOLPHI, CARRIE ) | |
| ADOLPHI, S.A.C.A., INC., d/b/a ) | |
| United Consumers Club of ) | |
| Syracuse, New York, THOMAS ) | |
| CALLAHAN, SR., THOMAS CALLAHAN,) | |
| JR., TEC ASSOCIATES d/b/a ) | |
| United Consumers Club of ) | |
| Baltimore, Maryland, JAMES ) | |
| COCHRAN, MONICA COCHRAN, ) | |
| COCHRAN MANAGEMENT SERVICES ) | |
| d/b/a United Consumers Club of ) | |
| Ann Arbor, Michigan, and the ) | |
| EMANCIPATION TRUST, ) | |
| ) | |
|       Counterdefendants ) | |


<u>OPINION AND ORDER</u>

This matter is before the court on Motion for Summary
Judgment, Reconsideration of Previous Summary Judgment Order, and
Clarification of Remaining Legal Issues Prior to Trial filed by

the counterdefendants on October 31, 2006 (DE 241); the Motion to
Strike Attorneys' Fees Contentions as Premature filed by the
counterplaintiffs on December 5, 2006 (DE 244); and the Motion to
Strike Argument Relating to Bledsoes' Guaranty filed by the
counterplaintiffs on December 5, 2006 (DE 245). For the reasons
set forth below, the motion to strike attorneys' fees contentions
is **GRANTED**, the motion to strike Guaranty argument is **DENIED**, and
the motion for summary judgment is **GRANTED IN PART** and **DENIED IN
PART.**

## Background

The history of this matter has been documented in prior
opinions of this court. *See **United Consumer Club, Inc., v.
Bledsoe***, 441 F.Supp.2d 967, 971-73 (N.D. Ind. 2006); Opinion and
Order, August 14, 2006 (DE 237); Opinion and Order, September 3,
2003 (DE 157).  This matter arose as a nine-count complaint
asserted by United Consumer Club franchises and their individual
officers against the franchisor. Across nine years of litigation,
the original claims have been dismissed, leaving counterclaims
against 10 of the original 15 plaintiffs, five corporate plain-
tiffs, and the plaintiffs' litigation-funding mechanism, the
"Emancipation Trust." The counterdefendants include Mark and
Kelly Bledsoe n/k/a Beckley, who operated the corporate defendant
Kellmark; Steven and Carrie Adolphi, who operated the corporate
defendant S.A.C.A.; Dennis Gain and Eng Lim, who operated the
defendant company Persona Grata Inc.; and TEC Associates Inc. All
of the claims arise out of the contracts entered into between

2

United Consumer Club, Inc. (UCC), its affiliates, and various franchisee entities, and the subsequent relationship between these parties.

Franchisees of United Consumer Club were subject to a series of contracts that governed their relationship to the franchisor. Generally, the Franchise Agreements granted the franchisee the right to sell memberships in UCC, a buyers club which contracts with manufacturers to sell merchandise to club members at whole-sale prices. The Franchise Agreements obligated the franchisee to pay royalty fees for the memberships that it sold and also contained a section that obligated the franchisee to pay to UCC any unpaid "royalty fees, service fees, advertising contribu-tions, [and] amounts owed for merchandise" in the event the franchise terminated or expired. (UCC Exh. A, Franchise Agree-ment, §16(A)) The Agreement's "enforcement" section further provided that the exercise of rights under the agreement shall not "preclude the exercise or enforcement . . . of any other right or remedy." (UCC Exh. A §18(E))  This section provided that in a legal proceeding to enforce the agreement, "the party prevailing . . . shall be entitled to reimbursement of its costs and expenses, including reasonable accounting and legal fees." (UCC Exh. A §18(F))

UCC franchises were entitled to sell memberships under installment financing agreements. These agreements included a provision on their second page, separate from the contract with the buyer, through which the franchise assigned the installment

contract to UCC affiliate Beta Finance Company. This section stated that "this assignment is made 'With Recourse' and we agree that the within contract will be paid according to its tenor and that if it is not, we shall pay it to the assignee." (Declaration of Eng Lim, Exhibit)  When sold under an installment agreement, the franchise royalties due UCC were deferred under a Beta Royalty Deferment Agreement which franchisees, defined in the agreement as both the corporate entity and individuals, entered concurrently with a Beta servicing or financing agreement. (UCC Exh E) In some cases, this latter agreement required the franchisee to execute the assignment contained with the retail installment contract.

UCC's counterclaims initially were addressed by this court in response to the counterdefendants' motion for summary judgment (*see Bledsoe*, 441 F.Supp.2d at 967) and the counterplaintiffs' Supplemental Brief in Opposition to Summary Judgment (*see* Opinion and Order, August 14, 2006 (DE 237)). Some, but not all, of the counterclaims withstood summary judgment and will be resolved at trial. Specifically, this court concluded that from among a series of claims sounding in tort and breach of contract, summary judgment was not appropriate on the following claims:

> 1)   Breach of the Franchise Agreements and Beta Finance Agreements against Persona Grata North America, Inc., S.A.C.A. Inc., and Kellmark Corporation;
>
> 2)   Breach of the Franchise Agreement Assignment by TEC Associates;

4

3)    Breach of Personal Guarantees and Beta
      Finance Agreements by Eng Lim and Dennis
      Gain, Steven and Carrie Adolfi, and Mark
      and Kelly Bledsoe n/k/a Beckley. This
      claim is stayed against the Adolfis
      only.

4)    Conspiracy to commit defamation *per quod*
      based on allegations made in a Wall
      Street Journal article that UCC lied
      about membership, renewal rates, and
      savings. This claim also is stayed
      against just the Adolfis.

5)    Conspiracy to commit defamation *per se*
      based on the statement that UCC is buy-
      ing second quality products from sources
      other than direct from the manufacturers
      and adding markup to those prices, con-
      tained in a letter sent to club members.
      This claim is stayed against the Adol-
      fis.

6)    Defamation by Eng Lim based on two docu-
      ments that he mailed to all UCC franchi-
      sees.

After an unsuccessful settlement conference on September 19, 2006, the counterdefendants were granted until October 31, 2006 to file a motion for summary judgment regarding these remaining claims. (DE 240)

## Discussion

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986); *Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004); *Branham v. Snow*, 392 F.3d 896, 901 (7th Cir. 2004); *Windle*

*v. City of Marion, Indiana*, 321 F.3d 658, 660-61 (7th Cir. 2003), *cert. denied*, 540 U.S. 873, 124 S.Ct. 873, 157 L.Ed.2d 133 (2003).  The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party.  *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); *Lawrence*, 391 F.3d at 841. A fact is material if it is outcome determinative under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Ballance v. City of Springfield, Illinois Police Department*, 424 F.3d 614, 616 (7th Cir. 2005); *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004); *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003).  Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals a good faith dispute as to inferences to be drawn from those facts.  *Spiegula v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004); *Hines v. British Steel Corporation*, 907 F.2d 726, 728 (7th Cir. 1990).  Finally, summary judgment "will not be defeated simply because motive or intent are involved." *Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 148 (7th Cir. 1994).  *See also Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999); *Plair v E.J. Brach & Sons, Inc.*, 105 F.3d 343, 346 (7th Cir. 1997); *United Association of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1268 (7th Cir. 1990).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511

*See also* *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-22 (2000) (setting out the standard for a directed verdict); *Celotex Corp.*, 477 U.S. at 322-323, 106 S.Ct. at 2553; *Branham*, 392 F.3d at 901; *Lawrence*, 391 F.3d at 841; *Hottenroth*, 388 F.3d at 1027 (stating that a genuine issue is one on which "a reasonable fact finder could find for the nonmoving party"); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003)(stating that a genuine issue exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party).

The counterdefendants raise a series of issues for reconsideration prior to trial. They again argue that, in the event of

their liability, the Franchise Agreements prohibit damages for
future lost royalties. (Motion for Summary Judgment, pp. 4-11)
They assert that claims for breach of the personal guaranty lie
only against the corporate defendants, not the individuals.
(Motion, pp. 17-18) They provide a series of arguments regarding
the ultimate availability of attorneys' fees regarding the
various tort and contract claims that have been raised in this
matter. (Motion, pp. 18-25) The Cochran counterdefendants and
counterdefendant Dennis Gain argue that they cannot be held
liable for conspiracy to defame.(Motion, pp. 22-23, 25) Gain and
Lim also claim that they cannot be held liable for contract
damages above $500,000 based on provisions in the guaranty they
signed. (Motion, p. 25) The counterdefendants argue that the
libel claim based upon the article that appeared in the Wall
Street Journal should be dismissed because statements made in the
article are true and, consequently, not actionable. (Motion, pp.
27-34) Finally, the counterdefendants argue that the libel claim
arising from letters sent to UCC franchisees were never pled in
the amended counterclaim. (Motion, pp. 35-36)

     The counterdefendants present no argument regarding a series
of counterclaims. Accordingly, the following claims will be
addressed at trial and warrant no further discussion here:

     1.   Breach of the Franchise Agreement with respect to
          the corporate entities Persona Grata North Amer-
          ica, S.A.C.A, Inc. and Kellmark Corporation;

8

2.   Breach of the franchise agreement assignment by
     TEC Associates;

3.   Breach of the Beta Finance Agreement with respect
     to Persona Grata North America, S.A.C.A, Inc. and
     Kellmark Corporation;

4.   Breach of the personal Guaranty by Eng Lim, Dennis
     Gain, and Steve and Carrie Adolfi.

5.   Conspiracy to commit defamation per se against
     Mark and Kelly Bledsoe n/k/a Beckley, Kellmark
     Corporation, Eng Lim, Persona Grata, Steve and
     Carrie Adolfi, S.A.C.A. Inc., Thomas Callahan Jr.,
     TEC Associates, and the Emancipation Trust.

6.   Defamation based on documents mailed to UCC mem-
     bers against Eng Lim.

### I. Motions to Strike

Before reaching the arguments regarding the remaining claims, the court first must address two motions to strike filed by UCC. In its first motion to strike, UCC seeks to strike as premature a variety of arguments made by the counterdefendants regarding the imposition of attorney fees. The counterdefendants argue that because the case is likely to have substantial attorney fee issues, the court should address "the fact of attorneys fees" though reserving decisions on "the amount, if any, of attorneys fee."

The court agrees that resolution of attorney fees issues is best left for after the trial. *See* Federal Rule of Civil Proce-

dure 54(d)(2)(A); Local Rule 54.1.  In addition, the counter-
defendants' attempts to raise attorneys' fee issues pre-trial
are, in fact, attempts to reach ultimate liability on issues that
this court already has decided must be heard by a jury.

For the sake of clarity, some further discussion is war-
ranted. The counterdefendants' first issue is easily disposed of.
The Callahan counterdefendants argue that they cannot be held
liable for attorneys' fees on breach of contract claims. The
counterplaintiffs admit that there is no breach of contract claim
asserted against the Callahan counterdefendants. Consequently,
there is no dispute on this issue.

As a result of this court's Order of July 17, 2006, coun-
terclaims that remained against Mark and Kelly Bledsoe n/k/a
Beckley included breach of the personal guaranty and breach of
the Beta Finance agreement. Their corporate identity, Kellmark,
continued to face claims for breach of the Franchise Agreement
and breach of the Beta Finance agreement. These counterdefendants
assert that they cannot be liable individually for attorney fees
associated with any contract claim because 1) individual
counterdefendants cannot be held liable for breach of the Beta
Finance contracts; 2) the Bledsoes did not sign a personal
guaranty; and 3) the Bledsoes are not individually parties to the
assignment under which their corporation, Kellmark, became bound
to the UCC Franchise Agreement. These arguments do not regard
attorneys' fees but instead seek rulings on the underlying merits
of UCC's counterclaims. The first two of these defenses are

10

asserted independently in the counterdefendants' motion and will be addressed more fully below.

Regarding the Bledsoes' individual liability on the Franchise Agreement, the fact that the Bledsoes did not individually sign the agreement under which Kellmark was assigned a pre-existing UCC franchise is not disputed. In July 2006, this court concluded, without objection, that the Bledsoes individually remained subject to UCC's claims for breach of the personal guaranty and breach of the Beta Finance Agreements, not the Franchise Agreement. *See Bledsoe*, 441 F.Supp.2d at 988. UCC's claim for breach of the Franchise Agreement survived only against the corporate entities. This conclusion was reaffirmed in this court's August 14, 2006 Order. It follows that the Bledsoes, individually, cannot be liable for attorneys' fees with respect to a claim that has not been brought against them individually.

Accordingly, UCC's motion to strike the counterdefendants' arguments regarding attorneys' fees is **GRANTED**. To the extent the counterdefendants have attempted to transform these arguments into defenses to ultimate liability, the arguments present questions of fact to be resolved at trial.

UCC also seeks to strike the Bledsoes' statement that they never signed a personal guaranty. UCC argues that the Bledsoes have offered no evidence to support this assertion. In response, the counterdefendants have offered the affidavits of Mark and Kelly Bledsoe n/k/a Beckley stating that no personal guaranty was signed. UCC has not filed a timely reply nor produced a copy of a

11

separate personal guaranty signed by the Bledsoes individually, despite asserting a claim based on this document. If UCC is to maintain a claim based on the execution of a written instrument, their initial burden of providing evidence of the document's existence cannot be shifted by requiring the counterdefendant to prove its non-existence. The motion to strike is **DENIED**.

## II. Future Royalties

In their motion for reconsideration, the counterdefendants again argue that damages based on future royalties are prohibited by the Franchise Agreement. On this subject the court concluded in its prior Order that "the counterdefendants' arguments regarding proximate cause, reasonable certainty, and mitigation present questions of fact." ***Bledsoe***, 441 F.Supp.2d at 987-988.[1]

Three inquiries guide a determination that lost profit damages are available. The party seeking damages for lost profits must show that the damages were caused by the breach, that lost profit damages were within the contemplation of the parties when the contract was entered into, and that the loss is capable of proof with reasonable certainty. ***Ashland Management Incorporation v. Janien***, 82 N.Y.2d 395, 403, 624 N.E.2d 1007, 1010 (1993); ***International Telepassport Corporation v. USFI, Inc.***, 89 F.3d 82, 85 (2nd Cir. 1996). In ***Ashland***, the New York Court of Appeals further noted that the "breaching party need not have foreseen the breach itself . . . it is only necessary that the loss from a

---

[1]As noted in the court's July Order, the contract claims are governed by choice of law provisions in the contracts that dictate the application of New York and Rhode Island law. ***Bledsoe***, 441 F.Supp.2d at 987.

breach is foreseeable and probable." *Ashland*, 82 N.Y.2d at 403, 624 N.E.2d at 1010 (*citing* the Restatement (Second) of Contracts §351) This section of the Restatement further notes that "the requirement of foreseeability is a more severe limitation of liability than is the requirement of substantial or 'proximate' cause in the case of an action in tort or for breach of war-ranty." *See* Restatement (Second) of Contracts §351, cmt. a (1981). The court in *Ashland* also noted that the need to prove lost profits with reasonable certainty "does not require absolute certainty. The law does not require that they be determined with mathematical precision." *Ashland*, 82 N.Y.2d at 403, 624 N.E.2d at 1010.

As noted in this court's prior orders, whether any breach occurred, and by whom, are questions of fact that will be re-solved at trial. Accordingly, it cannot be shown at this stage whether damages, if any, were caused by a breach. Nevertheless, the counterdefendants argue that lost profit damages cannot be established with reasonable certainty. The court already has determined that this is a question of fact. *See Bledsoe*, 441 F.Supp.2d at 987. The counterdefendants have challenged the credibility of the UCC witness on this topic and have submitted their own factual assertions, primarily counterdefendant Eng Lim's membership records from the Persona Grata franchise.  This reemphasizes the conclusion that factual issues predominate this question.

13

The counterdefendants also cite to a provision within the Franchise Agreement to argue that the agreement shows that lost profit damages were not within the contemplation of the parties. When a contract is unambiguous, the interpretation of that contract is a matter of law. *Elite Promotional Marketing, Inc. v. Stumacher*, 8 A.D.3d 525, 526, 779 N.Y.S.2d 528, 530 (2 Dep't. 2004)("The nature of the obligation undertaken depends upon the parties' intention, and where that intention may be gathered from the four corners of the instrument, interpretation of the contract is a question of law."). If the contract is capable of multiple interpretations, discerning the intent of the parties presents a question for the factfinder. *See Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2nd Cir. 2001)(applying New York law). However, the determination that a contract is ambiguous is made by the court as matter of law. *Scholastic, Inc.*, 259 F.3d at 82 (*citing W.W.W. Associates v. Giancontieri*, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990)). *See also Dubis v. East Greenwich Fire District*, 754 A.2d 98, 100 (R.I. 2000). "When interpreting a contract, it must be read as a whole so as to avoid undo [sic] emphasis on particular words or phrases. A provision purporting to limit damages must be clear to be enforceable." *Crow & Sutton Associates, Inc. v. Welliver McGuire, Inc.,* 32 A.D.3d 651, 820 N.Y.S.2d 179, 180 (3 Dep't. 2006); *Scholastic Inc.*, 259 F.3d at 83. *See also Rivera v. Gagnon*, 847 A.2d 280, 284 (R.I. 2004).

Regardless of the inability at this stage to resolve the existence of a breach or the certainty of lost profit damages

that may flow if a breach is found, the counterdefendants assert that the terms of the Franchise Agreement show that lost profit damages were not within the contemplation of the parties. The counterdefendants rely on Section 16(A) of the agreement, which requires the payment on termination or expiration of the franchise of royalty fees, service fees, advertising contributions, amounts owed for merchandise purchased by the franchisee, "and all other amounts owed to the company and its affiliates which are then unpaid." The counterdefendants have not shown that this provision was intended as a remedial limit. It merely establishes provisions for handling specific unpaid expenses following a termination.

There is no indication that this clause is irreconcilable with a later provision, Section 18, regarding enforcement of the contract. This section provides that the right of both parties to enforce the agreement "by any right or remedy" under the contract does not preclude that party from pursuing "any other right or remedy" to which it is entitled by law. There is no inability to give effect to both Section 16 and Section 18 of the Franchise Agreement. Read together, these sections simply state that, in the event of both a breach *and* termination (because a breach need not be assumed to be a total breach resulting in the termination of the contract), UCC has the right to collect unpaid amounts *and* to pursue any remedies provided by law. This intent also can be gleaned from the heading given to Section 18 - "rights of parties are cumulative." *See **HSBC Bank USA v. National Equity Corp.**,* 279

A.D.2d 251, 253, 719 N.Y.S.2d 20, 22 (1 Dep't. 2001)("Rather, the rule is that where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect.") (internal quotations and citations omitted). As a result, it cannot be said that the agreement demonstrates an intent to prohibit damages for lost profits.

The counterdefendants also have not shown that, in the event that they are found to have breached the agreement(s), enforcement of the contracts' provisions would be unconscionable. An unconscionable agreement requires a showing that a contract was both procedurally and substantively unconscionable. ***Warburg, Pincus Equity Partners v. Keane***, 22 A.D.3d 321, 322, 802 N.Y.S.2d 420, 422 (1 Dep't. 2005). Courts in both New York and Rhode Island rely on the traditional statement that unsconcionability is demonstrated when an agreement is "so one-sided that it shocks the conscience such that no person in his or her senses and not under delusion would make it on the one hand and no honest and fair person would accept it on the other." ***Kojovic v. Goldman***, 823 N.Y.S.2d 35, 39 (1 Dep't. 2006)(internal quotations omitted); ***Grady v. Grady***, 504 A.2d 444, 446-47 (R.I. 1986)(*quoting* ***Hume v. United States***, 132 U.S. 406, 411, 10 S.Ct. 134, 136, 33 L.Ed. 393 (1889)).

Substantive unconscionability may be determined from the face of the contract when it demonstrates inflated prices, grossly inadequate compensation, unfair disclaimers or warranties, or substantially unfair termination clauses. ***Matter of***

*Friedman*, 64 A.D.2d 70, 85, 407 N.Y.S.2d 999, 1008 (2 Dep't. 1978); *Brennan v. Bally Total Fitness*, 198 F.Supp.2d 377, 382 (S.D.N.Y. 2002). Procedural unconscionability regards contract formation that has been dominated by a disparity of bargaining power, experience or education, or the use of deceptive tactics. *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 11, 537 N.Y.S.2d 787, 791 (1988); *Brennan*, 198 F.Supp.2d at 382.

The counterdefendants argue that a franchise agreement can have some of the characteristics of a contract of adhesion. They present no evidence that the agreements with UCC or its affiliates were contracts of adhesion, typically characterized by presenting a "take it or leave it" choice to the party with lesser bargaining power. *See Love'M Sheltering, Inc. v. County of Suffolk*, 33 A.D.3d 923, 924, 824 N.Y.S.2d 98, 99 (2 Dep't. 2006)("A contract of adhesion contains terms that are unfair and nonnegotiable and arises from a disparity of bargaining power or oppressive tactics.").

The counterdefendants state that the agreement(s) are substantively unconscionable because it would be unconscionable to impose lost income damages when the franchises no longer are operating. The court already has determined that a jury could conclude that lost income damages were within the contemplation of the parties as demonstrated by the agreements between them. The counterdefendants have not shown that the terms of these agreements were not the bargained for terms of the parties but instead the product of unfair bargaining power or deceptive

17

tactics. *Rivera*, 847 A.2d at 285 ("It is a basic tenet of contract law that the contracting parties can make as good a deal or as bad a deal as they see fit."). The question of lost profit damages remains a subject for the jury.

### III. Contract Claims

In the July 17, 2006 Order, this court stated that "while the other claims survive summary judgment, the court notes that the parties have not clearly stated which counterplaintiffs and counterdefendants are signatories to the remaining contracts at issue." *Bledsoe*, 441 F.Supp.2d at 988. For instance, as already discussed, there is no evidence before the court that Mark and Kelly Bledsoe signed a personal guaranty. Accordingly, summary judgment is proper in favor of Mark and Kelly Bledsoe n/k/a Beckley on UCC's claim for breach of the personal guaranty.

In sorting through these claims, the counterdefendants assert that only the corporate entities can be held liable for breach of the Beta Finance Agreements. Under these agreements, when a UCC franchise sold and financed a membership under a separate retail installment contract, this installment contract was assigned to UCC affiliate Beta Finance.[2] The Beta Finance Agreement was entered into between Beta, the franchise, and the individual counterdefendants. Under the contract's terms, references to the "franchisee" referred to both the corporate fran-

---

[2]In fact, the agreements classified the retail installment contracts in different degrees and whether the assignment of the installment contract occurred was based on this classification. This feature is not pertinent at this time.

18

chise and the individual counterdefendants, who also signed the agreements in that capacity.

The counterdefendants' argument is based on the fact that the underlying retail installment contract, which included the initial assignment of that agreement to Beta Finance, was signed by only the franchise, not the individual defendants. The counterdefendants' claim is that because the individual counterdefendants did not execute the assignment, the assignment's recourse provision does not obligate them individually. UCC does not dispute this conclusion. Rather, UCC claims that the individual counterdefendants' liability on the Beta Finance Agreements arises from provisions contained in other contracts. Section 16 of the Franchise Agreement, for instance, requires that upon termination or expiration of the franchise, the franchisee is obligated to pay "all other amounts owed to the company *and its affiliates* which are then unpaid." (emphasis added)  UCC further points to the personal guaranty signed by at least some of the individual counterdefendants, which specifically obligated the individual to guarantee the obligations undertaken in the Franchise Agreement, which UCC now argues encompasses the Beta Finance Agreement obligations. Finally, UCC notes that the counterdefendants individually signed the Beta Finance Agreements, if not the retail installment contract assignment.

It is not clear that the parties' intent in executing the Franchise Agreement, and where applicable the personal guaranty, was to create liability on the Beta Agreements, as UCC argues.

19

However, it is clear that the Beta Finance agreements obligated the individual defendants who signed them, independently of the assignment executed with the retail installment agreements by only the corporate franchises. The scope of these obligations and the potential that they give rise to damages, if any, which are identical to UCC's other contract claims, present questions that will be resolved at trial. Summary judgment for the individual defendants regarding breach of the Beta Finance Agreements is not appropriate.

The counterdefendants also present the alternative argument that the Beta Finance Agreements were not pled as the basis of any counterclaim. On July 10, 2006, UCC, in response to this court's order, clarified the scope of its contract counter claims. (*See* DE 232). In that response, UCC stated that it asserted claims against the individual counterdefendants for, among other, breach of the Beta Finance Agreements. This court held that this claim survived summary judgment in its July 17, 2006 Order and reaffirmed this conclusion in its August 14, 2006 Order. The counterdefendants now state in their reply brief that "the Beta Agreements have never been part of this case." Even if the court indulged the argument that the counterclaim did not state this claim, it is well beyond the point at which this argument can be raised. *See* Federal Rule of Civil Procedure 15(b)("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.").

20

The counterdefendants continue this argument stating that Beta
Finance Company was not a party to the personal guaranties and
these agreements do not indicate that Beta Finance was an in-
tended third-party beneficiary. This argument can be dismissed
because it has been raised for the first time in the parties'
reply brief. *See Hart v. Transit Management of Racine, Inc*.,  426
F.3d 863, 867 (7th Cir. 2005); *Hrobowski v. Worthington Steel
Company*, 358 F.3d 473, 480 (7th Cir. 2004).  In addition, UCC is
specifically named in the guaranty and is one of the counter-
plaintiffs. The counterdefendants provide no argument why UCC
itself cannot enforce the guaranty. Finally, though it has long
been clear that these claims are governed by New York and Rhode
Island law, the counterdefendants make this argument on the basis
of Indiana contract law. Accordingly, these arguments are waived.

    Finally, the counterdefendants address a provision contained
in the personal guaranty signed by Dennis Gain and Eng Lim which
provides that "in no event shall the aggregate amount of any
payments by the Guarantors under this Guaranty and Assumption of
Obligations exceed Five Hundred Thousand Dollars ($500,000.00)."
In the event that either Gain or Lim is found liable for a
breach, they argue that the total sum of this liability, includ-
ing attorney's fees, cannot exceed this $500,000 cap. In re-
sponse, UCC argues that Gain and Lim are not entitled to such a
limit under the separate Beta Finance agreements that they signed
individually and that guaranty was intended to limit only the

21

obligation to make "payments," but not amounts owed as the result of liability.

UCC's view of the guaranty appears to be betrayed by the language of the guaranty, which states that Gain and Lim "agree to be personally bound by, and personally liable for the breach of each and every provision in the [Franchise] Agreement." (Dec. of Lim, Exh.) The scope of the guaranty, and presumably, the limit to aggregate payments under it, includes liability for breach of the Franchise Agreement. The Franchise Agreement, in turn, provides for awards of attorney fees.  The Franchise Agreement does not make any specific reference to the Beta Franchise Agreements, but, as UCC has argued with respect to the Beta Finance Agreements, the Franchise Agreement can be read to encompass the obligations made by the counterdefendants to UCC and its affiliates.

UCC further contends that, regardless of the application of a limit, any liability incurred by Gain or Lim is subject to prejudgment interest which is determined based upon the full amount of any liability, even if it exceeds $500,000.00. UCC also argues that prejudgment interest, if applicable, would arise under Rhode Island law, not the guaranty, and consequently would not be subject to the limitation.

The counterdefendants did not respond to these arguments in their reply brief. In fact, they have confined their arguments with respect to this issue to just two sentences. The court will not comb through the various agreements entered into between the

22

parties beyond the level the parties have done in their briefing or the level already done in this order. As previously noted, the parties' intent regarding the interrelationship of the Beta Finance Agreements, the guaranty, the assignments, and the Franchise Agreement is not suitable for summary judgment. *See* *Tyler v. Runyon*, 70 F.3d 458, 465 (7th Cir. 1995)("Although we could search through the summary judgment record . . . if we did this we would be stepping outside the proper judicial role in an adversarial system.").

Regarding the remaining contract claims which will be subject to trial, the court ends up very near where it began. The following claims remain in this case:

> 1)    Breach of the Franchise Agreements and Beta Finance Agreements against Persona Grata North America, Inc., S.A.C.A. Inc., and Kellmark Corporation;
>
> 2)    Breach of the Franchise Agreement Assignment by TEC Associates;
>
> 3)    Breach of Personal Guarantees by  Eng Lim and Dennis Gain, and Steven and Carrie Adolfi.  This claim is stayed against the Adolfis only.
>
> 4)    Breach of the Beta Finance Agreement by Eng Lim and Dennis Gain, Steven and Carrie Adolfi, and Mark and Kelly Bledsoe n/k/a Beckley. This claim is stayed against the Adolfis only.

### IV Tort Claims

In the Orders of July 17, 2006 and August 14, 2006, the court concluded that the tort claims that must proceed to trial included the conspiracies to commit defamation *per quod* and *per se* against all counterdefendants and the claim of defamation

against Eng Lim based on two documents that he mailed to all UCC
franchisees.

Allegations of defamation surrounding statements made in an
article that appeared in the Wall Street Journal were addressed
in this court's July 2006 Order and reconsidered in the August
2006 Order. The court concluded that questions of fact required
that this claim go to trial. The counterdefendants now claim
that, because this article was not mentioned in the counterplain-
tiffs' amended counterclaim, it has not been raised properly and
should be dismissed. The notice pleading standard and the stan-
dards regarding amendments to conform to the evidence defeat this
argument. Federal Rules of Civil Procedure 8 and 15(b). *See also*
*Torry v. Northrop Grumman Corp*., 399 F.3d 876, 877-78 (7th Cir.
2005).

The counterdefendants also argue that James and Monica
Cochran and Cochran Management Services (Cochran counterdefen-
dants), as a matter of law, cannot be liable for conspiracy to
defame because they "did not enter the picture until months after
any putatively defamatory utterances." This same argument is
raised on behalf of defendant Dennis Gain. UCC, on the other
hand, relies on *State v. Roberts*, 124 N.E.2d 750 (Ind. 1919) to
argue that those who later join a conspiracy will be liable for
activities of co-conspirators that took place prior to their
arrival. *Roberts*, 124 N.E.2d at 752 ("[T]he rule is that one who
connects himself with an *existing conspiracy* and joins in carry-
ing out the common purpose and design will be deemed, in law, a

24

party to every act which had before been done by others . . . in furtherance of such design.")(emphasis added). *See also* **Baker v. State Bank of Akron**, 112 Ind. App. 612, 44 N.E.2d 257, 260 (Ind. App. 1942)("Persons entering into the conspiracy after its

formation are liable for all acts previously or subsequently done in pursuance thereof.").

As explicitly stated in **Roberts**, and common to the cases that impose liability on an actor for the prior actions of others taken on behalf of the conspiracy, that actor must join an "existing conspiracy." The on-going liability from the conspiracy naturally requires that the conspiracy be an on-going interest. Further, as noted by this court, "allegations of a civil conspiracy are just another way of asserting concerted action in the commission of a tort." **Bledsoe**, 441 F.Supp.2d at 975 (*citing* **Boyle v. Anderson Fire Fighters Association**, 497 N.E.2d 1073, 1079 (Ind. App. 1986).

UCC's civil conspiracy claim is based upon the defamation alleged as a result of the publication of statements in the Wall Street Journal and letters sent to UCC members. As already recognized by this court, a "civil conspiracy" under Indiana law is not a distinct claim, but instead an action for damages from multiple parties arising from the commission of a distinct tort. *See* **Goetzke v. Ferro Corporation**, 280 F.3d 766, 778 (7th Cir. 2002); **Boyle**, 497 N.E.2d at 1079. ("In sum, allegations of a

civil conspiracy are just another way of asserting concerted action in the commission of a tort.").

There is no evidence before the court regarding activity that took place subsequent to the publication of the Wall Street Journal article or the letters which was designed to further a conspiracy to defame UCC. *See **Bledsoe***, 441 F.Supp.2d at 977-80; Opinion and Order, August 14, 2006, pp. 22-27. It cannot be assumed, as UCC does, that a civil conspiracy continues indefinitely. Rather, the duration of the conspiracy claim is measured by the underlying tort of defamation based on the Wall Street Journal article and the letter sent to members.  The counter-plaintiffs do not dispute that the Cochran counterdefendants and Dennis Gain were not connected with the other alleged co-conspirators until "several months" after publication of the Wall Street Journal article and the member letters. The torts were completed, and the "civil conspiracy" with it. *See **Jones v. City of Chicago**,* 856 F.2d 985, 992 (7th Cir. 1988); ***U.S. v. Maloney***, 71 F.3d 645, 659 (7th Cir. 1995)("A conspiracy ends when its main criminal objective has been accomplished or abandoned."). Consequently, summary judgment on the conspiracy to defame claims arising from the Wall Street Journal article and member letters is appropriate for the Cochran counterdefendants and Dennis Gain.  *See e.g **Macomber v. Travelers Property and Cas. Corp**.,* 277 Conn. 617, 636-637, 894 A.2d 240, 255 (Conn. 2006)("This reasoning, however, does not extend so as to impose civil liability on a coconspirator for damage caused by the actual wrongdoer before the civil

26

coconspirator even joined the conspiracy. By that time, the underlying tort had already been completed.").

Finally, the counterdefendants have asserted that because UCC memberships did not number 500,000 and were not renewed at a 70% rate, as claimed, the statement in the Wall Street Journal that UCC lied about these figures is truthful, and consequently not actionable. UCC relies on a statement made by this court in its September 2003 Order addressing the counterdefendants' original fraud claims against UCC. Among the reasons that this court dismissed the claim was a conclusion that the then-plaintiffs had not supported their assertion that renewal rates were below 70% with any evidence. *See* Opinion and Order, September 3, 2003, p. 21 (DE 157). The plaintiffs' (now counterdefendants') evidentiary shortcomings cannot be stretched to prove anything regarding the actual renewal rates. The fact that they did not support the assertion that renewal rates were not 70% cannot be applied through law of the case as proof that the renewal rate in fact was 70%. This issue simply was not decided.  See *Jarrard v. CDI Telecommunications, Inc.* 408 F.3d 905, 912 (7th Cir. 2005).

The counterdefendants are silent regarding the further claim that they defamed UCC in the Wall Street Journal article also by alleging that UCC lied about the savings that members can achieve. Consequently, summary judgment on this claim as a whole is not appropriate for this reason.

The court also will not draw conclusions that remove the renewal rate or membership number questions from the case. The

27

counterdefendants quote a UCC vice president who testified that
the average bi-annual and annual renewal rate was 70 percent, but
that if renewals are assessed over a period of eight to ten
years, the number was lower. (Summary Judgment Mem. at p. 32).
The counterdefendants argue that this statement is inconsistent
with UCC's claim that "historically" renewal rates were 70 per-
cent. The counterdefendants read the word "historically" to mean
that this average is only accurate if it reflects "a historical
period of time, such as a ten year term." (Summary Judgment Mem.
at p. 32). The term "historically" is subject to more interpreta-
tions than that given it by the counterdefendants. Material
disputes remain over the means by which this figure was derived.
Both parties have advanced arguments to support both the accuracy
and inaccuracy of a claim to a 70% renewal rate. The parties also
dispute the usage of the terms "member" and "membership" as they
are used in tabulating whether UCC has 125,000, 250,000 or
500,000 memberships.  These questions, regarding the disputed
meaning given to terms used by the parties, are questions for the
factfinder.

As a result, regarding the tort counterclaims, summary
judgment is **GRANTED** to the Cochran counterdefendants and Dennis
Gain regarding the conspiracy to commit defamation *per quod* and
defamation *per se.* Otherwise, the tort claims that remain in the
case are those described in this court's prior Orders.

_____

For the foregoing reasons, the Motion to Strike Attorneys'
Fees Contentions as Premature filed by the counterplaintiffs on
December 5, 2006 (DE 244), is **GRANTED**; the Motion to Strike
Argument Relating to Bledsoes' Guaranty filed by the counter-
plaintiffs on December 5, 2006 (DE 245), is **DENIED**; and the
Motion for Summary Judgment, Reconsideration of Previous Summary
Judgment Order, and Clarification of Remaining Legal Issues Prior
to Trial filed by the counterdefendants on October 31, 2006 (DE
241), is **GRANTED IN PART** and **DENIED IN PART**. The claims that
remain in this case are:

1) Breach of the Franchise Agreements and Beta Fi-
   nance Agreements against Persona Grata North Amer-
   ica, Inc., S.A.C.A. Inc., and Kellmark Corpora-
   tion;

2) Breach of the Franchise Agreement Assignment by
   TEC Associates;

3) Breach of Personal Guarantees by  Eng Lim and
   Dennis Gain, and Steven and Carrie Adolfi.  This
   claim is stayed against the Adolfis only.

4) Breach of the Beta Finance Agreement by Eng Lim
   and Dennis Gain, Steven and Carrie Adolfi, and
   Mark and Kelly Bledsoe n/k/a Beckley. This claim
   is stayed against the Adolfis only.

5) Conspiracy to commit defamation *per quod* based on
   the allegation the UCC lied about membership,
   renewal rates, and savings as stated in the Wall
   Street Journal article. This claim survives
   against all counterdefendants with the exception
   of the Cochran counterdefendants and Dennis Gain.
   This claim is stayed against the Adolfis.

6) Conspiracy to commit defamation per se based on
   the statement in member letters that UCC is pur-
   chasing second quality products from sources other
   than the manufacturers and adding markup to those
   prices. This claim survives against all counter-

defendants with the exception of the Cochran counterdefendants and Dennis Gain. This claim is stayed against the Adolfis.

7)   Defamation by Eng Lim based on the two documents he mailed to all UCC franchisees.

ENTERED this 15th day of February, 2007

                              s/ ANDREW P. RODOVICH
                                 United States Magistrate Judge